UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH META
(FACEBOOK) ACCOUNT:
WWW.FACEBOOK.COM/RALDY.LARA,
WHICH IS STORED AT PREMISES
CONTROLLED BY META PLATFORMS, INC.

Case No.   23-mj-188-01-TSM

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, John Hannigan, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      This Affidavit is submitted in support of an application for a search warrant, under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), authorizing the government to search for, and require the disclosure of, records and other information particularly described in Attachment B located within Meta (Facebook) account: www.facebook.com/raldy.lara ("Raldy.Lara") particularly described in Attachment A, to include subscriber or customer information, which are stored at premises owned, maintained, controlled, or operated by Meta Platforms Inc. ("Meta"), a company headquartered in Menlo Park, California.

2.      I am a police officer employed by the Nashua Police Department in New Hampshire, and a deputized Task Force Officer ("TFO") to the U.S. Drug Enforcement Administration ("DEA") in the Manchester, New Hampshire District Office.  I am the case officer with primary responsibility over the investigation herein described.  I have direct and indirect knowledge of the following information.

3.      As a TFO to DEA, I am authorized to perform federal law enforcement functions outlined in 21 U.S.C. § 878(a), pursuant to cooperative enforcement arrangements authorized by

1

21 U.S.C. § 873(a)(7), including the execution and service of search warrants issued under the authority of the United States, which encompass the investigation of federal drug and money laundering violations under Title 21 and Title 18 of the United States Code.  As described later, I am engaged in the enforcement of federal criminal law, and, thus, I am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(c) authorized to apply for the requested search warrant.

4.     I have been a police officer with the Nashua Police Department ("Nashua P.D.") since 2010.  In September 2019, I transferred to Nashua P.D.'s Narcotics Intelligence Division, where I conducted investigations into narcotics-related offenses.  Since August 2021, I have served as a TFO to DEA's Strike Force in the Manchester, New Hampshire District Office. During my law enforcement career, I have attended narcotics and criminal investigation training classes offered by the New Hampshire Police Standards and Training Council, DEA, the Counterdrug Training Center, and Nashua P.D.

5.     My drug enforcement experience is varied.  I have participated in the execution of numerous search warrants resulting in the seizure of large quantities of controlled substances and paraphernalia used in the manufacture and distribution of controlled substances; United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds.  I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations, including surveillance, search warrant executions, and arrests.

6.      Through my training, education, and experience, I have gained a nuanced understanding of criminal drug distribution activity.  I have become generally familiar with the way that DTOs conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activities to avoid detection by law enforcement.  I am familiar with the various methods of operation employed by narcotics traffickers to further their illicit operations, including methods used by them to distribute, store, and transport narcotics, as well as methods used by them to collect, expend, account for, transport, and launder drug proceeds.  I am also familiar with the way that narcotics traffickers use personal and rented cars and trucks, common carriers, mail and private delivery services, and a variety of other motor vehicles to: (a) meet with co-conspirators, customers and suppliers; (b) transport, distribute, and purchase narcotics; (c) transport funds used to purchase narcotics; and (d) transport the proceeds of narcotics transactions.  I have also learned that narcotics trafficking typically involves the local, interstate, and international movement of illegal drugs, to distributors and co-conspirators at multiple levels, and the movement of the proceeds of narcotics trafficking among multiple participants including suppliers, customers, distributors, and money launderers. Specifically, within the United States, the District of New Hampshire and the District of Massachusetts, illegal drugs and drug money are most often transported in motor vehicles. Consequently, the location of vehicles used by narcotics traffickers and those working with them can be instrumental in identifying and intercepting shipments of illegal drugs and drug proceeds.

7.      I have consulted various sources of information to support my statements in this Affidavit.  These statements are based on my participation in this investigation, as well as information I consider reliable from the following sources: my experience investigating drug

trafficking offenses; oral and written reports and documents about this investigation that I have received from members of DEA, local law enforcement, and other federal law enforcement agencies; discussions I have had personally concerning this investigation with other experienced narcotics investigators; physical and fixed surveillance conducted by DEA and local law enforcement agencies, the results of which have been reported to me either directly or indirectly; public records and law enforcement databases; telephone toll records, pen register and trap and trace information, telephone subscriber information; and geolocation information.

8.     This Affidavit distinguishes between my direct and indirect knowledge of the matters asserted.  Unless otherwise indicated, the statements contained herein are summaries of information that I have received from other law enforcement officers, and I specifically relied on oral reports and opinions from other law enforcement officers. When information is based on my personal knowledge or conclusion, it will be so stated.

9.     This Affidavit is not an exhaustive account of information gathered during the investigation. As this Affidavit is being submitted for the limited purpose of establishing probable cause to support the issuance of the requested warrant, I have not included every fact concerning every aspect of the investigation that is known to me.  I have set forth only the facts that I believe are necessary to establish probable cause to support the issuance of the requested search warrant.

10.    Based on my training and experience, I submit that the facts contained in this Affidavit establish probable cause to believe that MELVIN VILLAR-LUGO and others, known and unknown to the government, have committed violations of 21 U.S.C. § 841 (distribution of controlled substances and possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances), and 21 U.S.C. § 843(b) (unlawful use of a communication facility), that evidence of these violations

4

particularly described in Attachment B will be found within the subject Meta (Facebook) account(s) particularly described in Attachment A.

**PROBABLE CAUSE**

11.     My statements in this Affidavit pertain to an investigation into a drug trafficking organization based in Lawrence, Massachusetts.  The information gathered so far indicates that the organization is led by one MELVIN VILLAR-LUGO, acting in cooperation and in coordination with others, and that Meta (formerly Facebook) account www.facebook.com/raldy.lara ("Raldy.Lara") has been used by MELVIN VILLAR-LUGO to arrange narcotic distribution activities.  Thus, the organization, its members, and their activities, are collectively referred to as the "RALDY DTO" throughout this Affidavit.

12.     During the investigation, law enforcement determined that Meta account "Raldy.Lara" was being used by VILLAR-LUGO based on several considerations, to include the following findings and observations.  First, on August 5, 2019, law enforcement conducted a controlled narcotic transaction in Salem, New Hampshire, directly with a male party who identified himself as "Raldy" and used a vehicle registered in Massachusetts to one Melvin Villar-Lugo.  Second, in connection with a January 31, 2022 controlled narcotic purchase by an undercover officer from the RALDY DTO, the individual using Meta Messenger username "Raldy.Lara" completed an eight-second video call with the undercover, which was recorded by the undercover.  A still photo of the recorded video call showed a heavy-set Hispanic male with a shaved head, whom investigators recognized as "Raldy" from the August 5, 2019 transaction.  Third, pursuant to a March 2022 warrant for records associated with Meta account "Raldy.Lara," investigators received responsive records and observed the same date of birth for Melvin Villar-Lugo that is shown in his Massachusetts driver's license and Dominican government

identification card, as well as an Apple iPhone device and email address.  Fourth, pursuant to a June 2022 warrant for iCloud records associated with the email address observed under the "Raldy.Lara" Meta account, investigators received responsive records and observed Apple ID "melvinvillar1998@outlook.es" and Account Name "Melvin Villar," among other information.

13.     During this investigation, law enforcement agents also gathered considerable evidence of narcotic distribution attributable to the RALDY DTO.  Specifically, from October 2021 through January 2023, investigators successfully completed approximately 14 controlled purchases of narcotics from the RALDY DTO, using both confidential sources ("CS") and undercover officers ("UC").  During these purchases, more than four different RALDY DTO drug "runners" were positively identified.  The procedures followed during these transactions were consistent with those prescribed by DEA.

14.     Further, during this investigation, law enforcement previously obtained and executed four search warrants for the "Raldy.Lara" Meta account and last received "Raldy.Lara" Meta account information in January 2023.  The factual information submitted in support of these warrants were described in prior affidavits, which are hereby incorporated by reference.  *See, e.g.,* 22-mj-42-01-AJ; 22-mj-103-AJ; 22-mj-188-01-AJ; 23-mj-12-01-AJ.  Signed copies of each of the four affidavits are also attached hereto as Exhibits 1, 2, 3, and 4, respectively.

15.     During the review of the information returned by Meta on the four search warrants, it was evident the RALDY DTO used the Meta Messenger platform as a way of arranging their narcotics transactions. Investigators reviewed hundreds of conversations in which these drug transactions were arranged.

16.     Since January 2023, investigators have completed an additional 14 controlled purchases of fentanyl from this DTO.  All of these transactions were arranged by the RALDY

DTO via communications with Meta Messenger account "Raldy.Lara." The following are examples of the controlled narcotic purchases conducted during that time. On January 26, 2023, an undercover officer purchased 50 grams of fentanyl from an individual later identified as CANDIDO ARMANDO DIAZ-FERNANDEZ near 4 Cherry Street in Lawrence, Massachusetts, consistent with terms previously agreed to by the undercover and the DTO via Meta Messenger account "Raldy.Lara." On March 30, 2023, an undercover officer purchased 185 counterfeit pills containing fentanyl from DIAZ-FERNANDEZ inside the restroom of Target in Salem, New Hampshire, consistent with terms previously agreed to by the undercover and the DTO via Meta Messenger account "Raldy.Lara." On May 8, 2023, an undercover officer purchased 29 grams of fentanyl and 200 counterfeit pills containing fentanyl from an individual later identified as JULIO RAFAEL MEJIA-BAEZ inside the restroom of TJ Maxx in North Andover, Massachusetts, consistent with terms previously agreed to by the undercover and the DTO via Meta Messenger account "Raldy.Lara." On May 17, 2023, an undercover purchased 59 grams of fentanyl from MEJIA-BAEZ inside the restroom of Walmart in Plaistow, New Hampshire, consistent with terms previously agreed to by the undercover and the DTO via Meta Messenger account "Raldy.Lara." On June 1, 2023, an undercover officer purchased 49 grams of fentanyl and 250 counterfeit pills containing fentanyl from an individual later identified as ALEXANDER LECHAPPELE within a store aisle of Dollar Tree in Methuen, Massachusetts, consistent with terms previously agreed to by the undercover and the DTO via Meta Messenger account "Raldy.Lara." On August 2, 2023, an undercover officer received 30 grams of fentanyl from LACHAPPELE near 16 Jasper Street in Lawrence, Massachusetts, consistent with terms previously agreed to by the undercover and the DTO via Meta Messenger account "Raldy.Lara."

17.     As a result of the controlled purchases, which were facilitated by Meta Messenger account "Raldy.Lara," investigators executed two separate federal search warrants on locations occupied by RALDY DTO drug "runners."  The execution of these search warrants resulted in the seizure of narcotics, narcotic milling equipment, and United States Currency, and multiple arrests.

18.     On October 6, 2023, Task Force Officer Matthew Blazon, operating in an undercover capacity, communicated with the RALDY DTO via Meta Messenger account "Raldy.Lara."  During the conversation the DTO agreed to sell TFO Blazon narcotics in the area of Haverhill, Massachusetts, showing that the Meta account "Raldy.Lara" remained active and that it continued to be used by the DTO for narcotic deals.  However, TFO Blazon stopped responding to the DTO and no purchase was set up.  Ultimately, on or about October 15, 2023, Meta shut down Meta account "Raldy.Lara" at the request of investigators.

19.     Based on the facts contained in this Affidavit, and related affidavits attached hereto and incorporated herein, I believe that VILLAR-LUGO has used Meta account "Raldy.Lara" as an initial point of contact with drug customers to arrange narcotic sales, which were likely completed by a "runner" dispatched by VILLAR-LUGO.  Further, I believe that these activities continued from the date of the last Meta warrant in January 2023 through the date on which Meta account "Raldy.Lara" was deactivated in October 2023.  This belief is consistent with the interactions between Meta Messenger account "Raldy.Lara" and undercover officers, which I have observed during the numerous controlled purchases of narcotics conducted by law enforcement during that time.  Although the account is no longer active, I believe that evidence of criminal drug activities will be found in the requested records.  To be sure that said records still exist, on or about October 13, 2023, a preservation request was served on Meta for the account associated with https://www.facebook.com/raldy.lara and Meta has indicated that it has taken

reasonable steps to preserve this account and assigned it Facebook Case #6816567, ensuring that the desired information still exists.  Thus, I believe that Meta account "Raldy.Lara" has been used by VILLAR-LUGO to facilitate the distribution of narcotics to customers from various places, including the District of New Hampshire.

## USE OF META (FACEBOOK) ACCOUNTS BY DTOs

20.     I know in my investigative experience that electronic communication services like Meta's Facebook platform can be used to facilitate drug distribution.  Given the perceived security of message encryption features available over platforms like WhatsApp, Facebook and Facebook Messenger, I know that some narcotics traffickers use voice and text messaging applications as a low-risk alternative to conventional telephonic voice or text communication.  I am also aware that narcotics traffickers often communicate in vague, guarded, or coded language when discussing their illegal business to conceal the nature of their unlawful operations.  Thus, the use of secret language over relatively secure applications like Facebook Messenger allows narcotics traffickers to manage the risk of police detection and advance their illicit activities.

21.     I know in my investigative experience that drug traffickers often "friend" other co- conspirators and take photographs and post them to their Meta accounts. I also believe that the requested search warrant will allow agents to identify other co-conspirators not yet known to this investigation. I also know that drug traffickers will often attempt to contact drug customers through Meta. In my experience, traffickers believe they will be safer if they investigate a potential customer's social media presence prior to meeting face-to-face. Traffickers believe that if they see a stronger social media presence, the less likely the customer could be an undercover officer.

22.     The desired materials subject to the requested warrant are likely preserved.  Said materials are likely preserved because a preservation request was served on Meta for the account associated with https://www.facebook.com/raldy.lara on or about October 13, 2023.  I am informed, Meta has indicated that it has taken reasonable steps to preserve this account, and it has assigned Facebook Case # 6816567.

23.     Meta Platforms Inc. owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Meta allows its users to establish accounts with Meta, and users can then use their accounts to share written news, photographs, videos, and other information with other Meta users, and sometimes with the general public.

24.     Meta asks users to provide basic contact and personal identifying information to Meta, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Meta passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Meta also assigns a user identification number to each account.

25.     Meta users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Meta assigns a group identification number to each group. A Meta user can also connect directly with individual Meta users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Meta and can exchange communications or view information about each other. Each Meta user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

26.     Meta users can select different levels of privacy for the communications and information associated with their Meta accounts. By adjusting these privacy settings, a Meta user can make information available only to himself or herself, to particular Meta users, or to anyone with access to the Internet, including people who are not Meta users. A Meta user can also create "lists" of Meta friends to facilitate the application of these privacy settings. Meta accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Meta.

27.     Meta users can create profiles that include photographs, lists of personal interests, and other information. Meta users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Meta users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Meta users can "check in" to particular locations or add their geographic locations to their Meta posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

28.     Meta allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Meta users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Meta's purposes, the photos and videos associated with a user's account will include all

photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

29.    Meta users can exchange private messages on Meta with other users. Those messages are stored by Meta unless deleted by the user. Meta users can also post comments on the Meta profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Meta has a chat feature that allows users to send and receive instant messages through Meta Messenger. These chat communications are stored in the chat history for the account. Meta also has Video and Voice Calling features, and although Meta does not record the calls themselves, it does keep records of the date of each call.

30.    If a Meta user does not want to interact with another user on Meta, the first user can "block" the second user from seeing his or her account.

31.    Meta has a "like" feature that allows users to give positive feedback or connect to particular pages. Meta users can "like" Meta posts or updates, as well as webpages or content on third- party (i.e., non-Meta) websites.

32.    Meta has a search function that enables its users to search Meta for keywords, usernames, or pages, among other things.

33.    Each Meta account has an activity log, which is a list of the user's posts and other Meta activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Meta page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Meta page.

34.    Meta also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

35.     In addition to the applications described above, Meta also provides its users with access to thousands of other applications ("apps") on the Meta platform. When a Meta user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

36.     Meta also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Meta, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Meta profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

37.     Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Meta users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

38.     As explained herein, information stored in connection with a Meta account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a

Meta user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Meta account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Meta account at a relevant time. Further, Meta account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.

39.     Such information allows investigators to understand the geographic and chronological context of Meta access, use, and events relating to the crime under investigation. Additionally, Meta builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Meta "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Meta account owner. Last, Meta account activity may provide relevant insight into the Meta account owner's state of mind as it relates to the offense under investigation. For example, information on the Meta account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

40.     Therefore, the computers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and

their use of Meta, such as account access information, transaction information, and other account information.

## **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

41.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## **CONCLUSION**

42.     Based on the foregoing, I request that the Court issue the requested search warrant.

43.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Meta.  Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

44.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the U.S. District Court for the District of New Hampshire is "a district court of the United States" with jurisdiction over the offense(s) being investigated. 18 U.S.C. § 2711(3)(A)(i).

/s/ John Hannigan
_____

John Hannigan
Task Force Officer
U.S. Drug Enforcement Administration

The affiant appeared before me by telephonic conference, on this date, pursuant to Fed. R. Crim. P. 4.1, and affirmed under oath the content of this affidavit and application.

Date:   **Oct 27, 2023**

Time:   **4:39 PM**

United States Magistrate Judge
**Talesha L. Saint-Marc**

16

## **ATTACHMENT A**

### **Property to be Searched**

This warrant applies to information associated with the Meta (Facebook) account associated with the account www.facebook.com/raldy.lara (Facebook Case #6816567) that is stored at premises owned, maintained, controlled, or operated by Meta Inc., a company headquartered in Menlo Park, California.

## <u>ATTACHMENT B</u>

### Particular Things to be Seized

**I.     Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities, from January 1, 2023 to the present;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, from January 1, 2023 to the present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments;
gifts; pokes; tags; and information about the user's access and use of Facebook
applications;

(e)      All records or other information regarding the devices and internet browsers
associated with, or used in connection with, that user ID, including the hardware
model, operating system version, unique device identifiers, mobile network
information, advertising ID, and user agent string;

(f)      All other records and contents of communications and messages made or received
by the user, from January 1, 2023 to the present, including all Messenger activity,
private messages, chat history, video and voice calling history, and pending
"Friend" requests;

(g)      All "check ins" and other location information;

(h)      All IP logs, including all records of the IP addresses that logged into the account;

(i)      All records of the account's usage of the "Like" feature, including all Facebook
posts and all non-Facebook webpages and content that the user has "liked";

(j)      All information about the Facebook pages that the account is or was a "fan" of;

(k)      All past and present lists of friends created by the account;

(l)      All records of Facebook searches performed by the account, from January 1, 2023
to the present;

(m)      All information about the user's access and use of Facebook Marketplace;

(n)      The types of service utilized by the user;

(o)      The length of service (including start date) and the means and source of any
payments associated with the service (including any credit card or bank account

number); including any and all transactions associated with the Visa Card

411770-XX-XXXX-5311

(p)    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)    Records of any Facebook accounts that are linked to the account by machine cookies (meaning all Facebook user IDs that logged into Facebook by the same machine as the account); and

(r)    All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

(s)    Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. § 841 (distribution of controlled substances and possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances), and 21 U.S.C. § 843(b) (unlawful use of a communication facility) since January 1, 2023, including, for each user identified in Attachment A, information pertaining to the following matters:

(a)    The unlawful acquisition, possession or distribution of controlled substances and theunlawful use of a communication facility;

(b)     Evidence indicating how and when the Meta account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c)     Evidence indicating the Meta account owner's state of mind as it relates to the crime under investigation;

(d)     The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s);

(e)     The identity of person(s) who communicated with the user about matters relating tothe acquisition, possession, or distribution of controlled substances.

# EXHIBIT 1

# (22-mj-42-01-AJ)

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION PERTAINING TO THE META (FACEBOOK) ACCOUNT WWW.FACEBOOK.COM/RALDY.LARA | )  No.  22-mj-42-01-AJ<br>)<br>)<br>)  <u>FILED UNDER SEAL</u> |

## <u>AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT</u>

I, Task Force Officer John Hannigan being first duly sworn, hereby depose and state as follows:

### <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.  I make this affidavit in support of an application for a search warrant for information associated with a certain Meta account that is stored at premises owned, maintained, controlled, or operated by Meta Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with Meta.com/raldy.lara.

2.  I am a police officer employed by the Nashua Police Department (NPD since 2010. In September 2019, I transferred to NPD's Narcotics Intelligence Division, where I conducted investigations into narcotics-related offenses. Since August 2021, I have served as a Task Force Officer (TFO) to the Drug Enforcement Administration (DEA) Strike Force, Manchester, New

Hampshire District Office. I have attended narcotics and criminal investigation training classes administered by the New Hampshire Police Standards and Training Council, the DEA, the Northeast Counterdrug Training Center, as well as by the NPD.

3.  As a DEA TFO, I am authorized to investigate violations of the laws of the United States, including violations of the federal drug laws and money laundering laws in Title 21 and Title 18, respectively, of the United States Code. " I am a Federal Law Enforcement Officer within the meaning of  Federal Rule of Criminal Proceeding 41 (a)(2)(C), that is , a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a Search Warrant.

4.  Through my training, education, and experience, I have become generally familiar with the way drug trafficking organizations ("DTOs") conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. I have participated in the execution of numerous search warrants resulting in the seizure of large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances; United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants and executing arrests.

5.  Based on my training and experience, I am familiar with the methods of operation employed by narcotics traffickers. I am aware that some narcotics traffickers utilize other means of electronic communication – including the Meta Platforms Inc messenger application in support of their trafficking. I am also aware that narcotics traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

      a.     my experience investigating drug-trafficking offense

      b.     oral and written reports and documents about this investigation that I have received from members of the DEA, local law enforcement, and other federal law enforcement agencies;

      c.     discussions I have had personally concerning this investigation with experienced narcotics investigators;

      d.     physical and fixed camera surveillance conducted by the DEA and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

      e.     public records and law enforcement databases;

      f.     telephone toll records, pen register and trap and trace information, and telephone subscriber information; and

      g.     geolocation information.

6.  Unless otherwise indicated, the statements contained herein are summaries of information that I have received from other law enforcement officers, and I specifically relied on oral reports from other law enforcement officers. When information is based on my personal knowledge or conclusion, it will be so stated.

7.  Since this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of a search warrant, I have not included details about every aspect of the investigation. While this affidavit contains all the material information I am aware

of that is pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

8.  Based on the facts set forth in this affidavit, I submit that there is probable cause to believe, and I do believe, that Melvin VILLAR-LUGO and others known and unknown have committed, are committing, and will continue to commit violations of  21 U.S.C. § 841 (distribution of controlled substances and possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances), and 21 U.S.C. § 843(b) (unlawful use of a communication facility). There is also probable cause to search the information described in Attachment A for evidence of these crimes as described in Attachment B.

## CONFIDENTIAL SOURCE INFORMAITON (CS-1)

9.  Agents of the DEA and local officers have received information concerning the illegal drug trafficking activities of the Raldy Drug Trafficking Organization (Raldy DTO) from a confidential source. Pertinent to this investigation, agents have been receiving information from Confidential Source 1 (CS-1) regarding the drug trafficking activities of this DTO.

10.  CS-1 began providing information to agents on or about October 6, 2021.  CS-1's cooperation was in exchange for potential consideration in a pending New Hampshire state charge for possession of a controlled drug with intent to distribute.  In return for CS-1's cooperation in this case, agents have made no promises, nor did agents offer compensation or any other consideration. CS-1 has an extensive criminal history, including convictions for possession of a class A and B drugs, distribution of a class A and B drugs, Conspiracy to violate the controlled substance act and possession of a controlled substance within a school zone.

11. According to CS-1, CS-1 had a pre-existing drug-trafficking relationship with a Dominican drug trafficking organization led by an individual known as "Raldy".  CS-1 stated that it had been purchasing fentanyl from Raldy and his co-conspirators for approximately two years.  CS-1 stated that initially contacted Raldy through telephone number 978-881-8989 and also the Meta account (Formerly Facebook) of "Raldy.Lara." CS-1 told agents that arranged fentanyl purchases with Raldy and then traveled to a location designated by Raldy. CS-1 then met a "runner" (an individual tasked with delivering the drugs) in a public area to complete the exchange. CS-1 stated that a typical drug transaction occurred in the bathroom of a business or through the window of his car on a residential street in Lawrence or Methuen. CS-1 stated that it had done drug transactions with between 8-10 different "runners" over the course of its business with Raldy and his organization. CS-1 also stated that in the past approximately six months, it had primarily been in communication with Raldy via the Meta account https://www.facebook.com/raldy.lara. CS-1 stated that it did not believe the 978-881-8989 telephone was still being used.

12.  CS-1 conducted a controlled purchase of fentanyl from the Raldy DTO in October and January of 2021. These purchases will be detailed further in this affidavit. Additionally, in January of 2022, CS-1 successfully introduced an undercover agent into the Raldy DTO. Since the introduction of the undercover agent, the use of CS-1 has no longer been necessary.

13.  All information from CS-1 that could be corroborated by agents has proven true and accurate. For example, agents confirmed historical information provided by CS-1 through open source searches, social media searches, review of photographs, and review of police records.  In addition, toll records and photographs of call logs and text messages were used to verify contacts between CS-1 and the https://www.facebook.com/raldy.lara Meta account. To my knowledge,

CS-1 has never provided misleading or incorrect information to any law enforcement officer. For these reasons, I consider CS-1's information related to this investigation to be credible and reliable.

## **PROBABLE CAUSE**

14.  In October 2021 members of the Salem, New Hampshire Police Department (SPD) generated a confidential source, referred to as CS-1, who provided information into a Drug Trafficking Organization (DTO) based in Lawrence, Massachusetts. The CS advised this organization is utilizing the Meta (formerly Facebook) Account "Raldy Lara" to complete their narcotics transactions. I reviewed this account identified as https://facebook.com/raldy.lara. This account does not contain any personal information and appears to be created as a means of communication via the Meta Messenger application. During the investigation the subject operating the "Raldy Lara" Meta Account contacted me while I was operating in an undercover capacity. During this conversation I was able to capture an image of the male's face. This male is believed to be Melvin VILLAR-LUGO. The name "Raldy" is believed to be an alias of VILLAR-LUGO. Further explanation into this identification will be explained later in the affidavit to keep the series of events in chronological order.

**Controlled Buy #1:**

15.  On October 6, 2021, at the direction of Detective Lucas White from SPD, CS-1 contacted VILLAR-LUGO via the Meta Account "Raldy Lara" to purchase a quantity of fentanyl. The resulting conversation was as follows:

- • CS-1: Hey can I come see you Ill be there around 5 if that's ok.
- • VILLAR-LUGO: Yes what you nees?

• CS-1: I got $750.00

• VILLAR-LUGO: ok.ok.

16.  At approximately 4:30 p.m., Detective White, Special Agent (SA) MacDonald, and TFO Mansi met with CS-1 at a predetermined meeting location. Due to CS-1 not having a license, CS-1's significant other agreed to drive CS-1 to the anticipated deal.  CS-1, its significant other, and the vehicle were searched for contraband with negative results. CS-1 was given $750 in official advanced funds (OAF) and outfitted with recording/transmitting equipment. CS-1 was then instructed by Detective White to place a text to the target that read "I am almost there, I have 750."  At that point, the SPD detectives followed CS-1 in its vehicle to the McDonald's located at 235 South Broadway, Salem, NH as instructed.

17.  At approximately 4:54 p.m., the conversation via the Meta Account continued:

• VILLAR-LUGO: Salem, NH

• VILLAR-LUGO: my boy

• CS-1-: Yeah

• VILLAR-LUGO: ok, ok

• CS-1: Thank you

At approximately 5:08 p.m., CS-1 texted the target asking how long until he reached the McDonalds. The Target replied that he was on his way. At approximately 5:35 p.m., CS-1 again texted the target and asked for its location. The Target said that he was almost there and that there was traffic. CS-1 then had the following exchange with the Target:

• VILLAR-LUGO:  go to marshall, wall, walk

• CS-1: Oh ok

• VILLAR-LUGO:  lkm, in here now

• CS-1: Ok im walking over, I was at mcdonalds

• VILLAR-LUGO:  im bathroom marhall now, lkm, when you there

- CS-1: Ok bro im almost there
- VILLAR-LUGO:  what schoes you have, shoes
- CS-1: Here now, only 2 stalls, im in the end with boots black.

At that same time, SA MacDonald observed CS-1 exit its car and walk towards the Marshalls

store.

18.  At approximately 6:04 p.m., SA MacDonald observed CS-1 enter the front door of the

Marshalls. At that time, TFO Mansi observed CS-1 walk inside and enter the bathroom of the

Marshalls. At approximately 6:04 p.m., CS-1 texted the target:

- CS-1: Im here now
- VILLAR-LUGO:  go bathroom
- CS-1: ill be there in a minute, im sorry
- VILLAR-LUGO:  ok
- CS-1: Im in the bathroom now
- VILLAR-LUGO:  ok

At approximately 6:07 p.m., TFO Mansi observed CS-1 exit the bathroom and walk out of the

front door of Marshalls. SA MacDonald and Detective White observed CS-1 walk back towards

its car and return to the neutral location for debriefing. Approximately one minute after CS-1

exited the bathroom, TFO Mansi observed a Hispanic male, herein referred to as (HM1) with a

black shirt, black hat and a ponytail exit the bathroom and walk to the front area of the store.

Approximately one minute later, HM1 exited the Marshalls and walked south toward the Home

Depot.  Surveillance units attempted to follow HM1 but he was picked up by a taxi service and

surveillance was terminated. At this time in the investigation HM1 has not been identified.

19.  After CS-1 completed the deal, it was followed back to a neutral location where it

immediately surrendered the suspected fentanyl. Based upon both Detective White and SA

MacDonald's training and experience they recognized this substance relinquished by CS-1 to be

consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. CS-1 and its significant other were searched by law enforcement for contraband with negative results.  CS-1 confirmed that it had purchased the drugs in the bathroom from HM1, who was a Hispanic male with a ponytail and hat.

**Controlled Buy #2:**

20.  On January 25, 2022, Detective White and I contacted CS-1 to set up a controlled purchase of fentanyl from VILLAR-LUGO. At approximately 12:52 p.m., CS-1 contacted VILLAR-LUGO via the Meta Account "Raldy Lara." During the conversation, CS-1 was instructed to introduce an undercover officer via the Meta account to the DTO. A synopsis of the conversation follows:

- CS-1: Hey I'm coming down today bro. It'll be later like 5ish.
- VILLAR-LUGO: Ok good
- VILLAR-LUGO: What you need when you come
- CS-1: Hey I'll be there within an hour. I have 300
- VILLAR-LUGO: Ok
- CS-1: I'll go to Plaza in Methuen. I got one of my boys with my I said I'd hook you up with
- VILLAR-LUGO: Yes
- CS-1: Johnny trappz, he's on my Facebook.
- VILLAR-LUGO: Ok Perfect

As the conversation progressed CS-1 was directed to 170 Haverhill Street, Dollar Tree, Methuen, MA. Prior to the transaction, Detective White and I searched CS-1.  CS-1 was clear of any drugs, money, or contraband. CS-1 was provided with $300.00 in OAF to complete the transaction. Prior to the transaction, members of the MDO and SPD established surveillance in the area.

Acting in an undercover capacity I transported CS-1 to the Dollar Tree. CS-1 was directed to go inside while I waited in the vehicle. Under surveillance, CS-1 went into the Dollar Tree and a short time later returned to the UC vehicle because CS-1 could not locate the dealer. CS-1 again contacted VILLAR-LUGO via the Meta application and was directed to go back into the Dollar Tree. CS-1 entered the Dollar Tree and returned to me a short time later. CS-1 provided me with suspected fentanyl and information about the transaction. Based upon my training and experience I recognized the substance that CS-1 provided to me to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. CS-1 stated CS-1 met with an unknown Hispanic Male, later identified as Angel BAEZ, while in the Dollar Tree. BAEZ provided CS-1 with the suspected fentanyl packaged in a plastic bag. In exchange, CS-1 provided the male with $300.00 in OAF. Members of surveillance were able to follow this male to 97-99 Market Street Lawrence, MA. The identity of BAEZ was determined during a motor vehicle stop detailed later in this affidavit.

**Controlled Buy #3:**

21.  On January 31, 2022, at approximately 1:00 p.m., acting in an undercover capacity, I sent a message to the "RALDY Lara" Meta account via the messenger application to purchase a quantity of fentanyl. A synopsis of the conversation follows:

- UC: Can I come see you
- VILLAR-LUGO: Yes
- VILLAR-LUGO: LKM
- UC: Aight I will be in Salem in half hour
- VILLAR-LUGO: What you need
- UC: $300
- VILLAR-LUGO: Ok

22.  At approximately 2:15 p.m., I received a video phone call from the same Meta account "RALDY Lara." I answered the call and spoke with a heavy-set Hispanic Male, later identified as VILLAR-LUGO. The conversation lasted approximately 6 seconds and I advised VILLAR-LUGO that I had $300.00. I was unable to capture an image of VILLAR-LUGO during this conversation.

23.  At approximately 2:58 p.m., VILLAR-LUGO contacted me using the Meta application and directed me to Home Depot, 72 Pleasant Valley Street, Methuen, MA. A synopsis of the conversation follows:

- VILLAR-LUGO: 72 Pleasant Valley St Methuen, MA 01844 Estados Unidos
- Me: ok ty I'll be there in 15
- VILLAR-LUGO: Here now Lkm
- ME: Ok almost there
- VILLAR-LUGO: the second toilet enters the bathroom

24.  At approximately 3:21 p.m., I entered the restrooms in Home Depot and met a Hispanic Male, later identified as BAEZ. BAEZ handed me suspected fentanyl and in exchange I gave him $300.00 in OAF.  Based upon my training and experience I recognized this substance to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. BAEZ took the money and left the bathroom. I followed BAEZ out of the Home Depot where he entered a taxicab and left the area.

**Controlled Buy #4**

25.  On February 2, 2022, at approximately 12:03 p.m., acting in an undercover capacity, I again used the Meta Account "Raldy Lara" to negotiate to purchase a quantity of fentanyl. A synopsis of the conversation follows:

- UC: Hey can I come see yo
- VILLAR-LUGO: What you need
- UC: $300
- VILLAR-LUGO: Ok good
- VILLAR-LUGO: 186 Haverhill St Methuen, MA- Home Depot

26.  Prior to my arrival at the address, members of the MDO and SPD established surveillance there. Upon arrival at the location, I noted there was no Home Depot as anticipated. I subsequently video-called on the Meta account for further instructions.  VILLAR-LUGO answered the call. I noted he was the same male with whom I spoke on the video-call prior to the undercover purchase on January 31, 2022. VILLAR-LUGO instructed me to go into the Market Basket at that location and enter the bathroom to meet with his "runner." I affirmed and VILLAR-LUGO ended the call.

27.  A few minutes after the call, I entered the restroom and remained in a toilet stall awaiting further instructions. While in the bathroom I met with BAEZ, the same male with whom I had completed the prior undercover purchase on January 31, 2022.  Due to other individuals in the bathroom, we did not complete the transaction there.  Instead, I followed BAEZ to an aisle in the store where I watched him leave the suspected fentanyl on a store shelf. I then showed BAEZ the money and left it behind other items on the shelf. I collected the suspected fentanyl and BAEZ took the $300.00 in OAF. Based upon my training and experience I recognized this substance to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. I also observed an unidentified Hispanic female with him, herein referred to as HF2. Members of surveillance team followed BAEZ and HF2 back to their residence at 97-99 Market Street, Lawrence, MA after the transaction.

**Agents Identification of VILLAR-LUGO**

28.  During the video call referenced above, I was able to covertly record VILLAR-LUGO during the call. I showed this photograph to multiple agents.  SA Doud recognized the male from a prior investigation and advised that he believed this male to be VILLAR-LUGO based upon a prior investigation he conducted. After speaking with SA Doud and reviewing his report the following information is a synopsis on his identification of VILLAR-LUGO:

1.  In June of 2019 SA Doud received information from Officer Scott Powers of the Littleton, NH Police Department that a Hispanic male who goes by the name "Raldy" is actively selling fentanyl in Lawrence, MA. This male was identified as VILLAR-LUGO, which will be explained further. SA Doud was provided with a phone number for VILLAR-LUGO, which he began to converse with in order to set up an undercover purchase of fentanyl.

2.  On August 5, 2019 VILLAR-LUGO agreed to meet SA Doud at the Rockingham Mall, Salem, NH. SA Doud met with VILLAR-LUGO who provided SA Doud with a sample of approximately 15 grams of fentanyl and the two ended their contact.

3.  Surveillance was conducted on VILLAR-LUGO following the transaction and TFO Day-Lewis observed VILLAR-LUGO enter in a Honda Accord, MA Registration 8XE733. A query of this registration revealed this car was registered to Melvin VILLAR-LUGO (DOB 08/19/1998). SA Doud and TFO Day-Lewis later reviewed an RMV photograph of VILLAR-LUGO and confirmed he was the same male that provided SA Doud with the sample of fentanyl. As noted above VILLAR-LUGO was also operating under the name "Raldy" which is the same name he is using in this current investigation.

4.  I also reviewed the photograph of VILLAR-LUGO and noted he was the same male I had covertly recorded on Controlled Buy #4.

**Controlled Buy #5:**

29.  On February 7, 2022, at approximately 1:22 p.m., I sent a message to the Meta Account "Raldy Lara" to buy a quantity of fentanyl. A synopsis of the conversation follows:

- UC: Hey yo can I come see you
- VILLAR-LUGO: Yes
- UC: Only got $250 today
- VILLAR-LUGO: Ok come
- UC: Ok on my way
- VILLAR-LUGO: Go 39 Foster Street Lawrence.

As the conversation progressed, VILLAR-LUGO asked what vehicle I was driving. I described my Ford Escape SUV to VILLAR-LUGO, and he confirmed that his "runner" was on his way. Law enforcement then established surveillance in the area.

30.  At approximately 2:40 p.m., law enforcement observed BAEZ exit his house at 97-99 Market Street and walk to the area of 39 Foster Street. At 2:50 p.m. I parked in front of 39 Foster Street. I advised VILLAR-LUGO I had arrived at the location, and he informed me "30 segundos." A short time later I observed BAEZ, the same male with whom I had done the prior transactions, approach my driver's side window.  I gave him $250.00 in OAF and in exchange he provided me with suspected fentanyl. Based upon my training and experience I recognized this substance to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. BAEZ then walked back in the direction of his house. On March 2, 2022, I received the DEA lab results for the suspected

fentanyl, which indicated the substance purchased was positive for fentanyl. The lab indicated the weight of the fentanyl was 20.132 grams.

**Controlled Buy #6:**

31.  On February 14, 2022, 11:27 a.m., I contacted VILLAR-LUGO on the Meta application to arrange an undercover purchase of fentanyl. The conversation follows:

- UC: Hey Bro. Can I come see you.
- VILLAR-LUGO: Hey When
- UC: I can be down there in like an hour
- VILLAR-LUGO: Perfect Yes
- UC: Still good for the 10 sticks. I got 1,000
- VILLAR-LUGO: Really. Wtf. Why. hahahaha
- UC: I got customers now!
- VILLAR-LUGO: Ok. My brother
- UC: I thought we talked about it last week about it sorry bro
- R: No problem. And ready for you. Ok

As the conversation progressed, I was directed to Home Depot, 72 Pleasant Valley Street, Methuen, MA. Several minutes later I received another message stating, "67 Pleasant Valley St Methuen, MA, Target is better."  Members of the MDO and SPD established surveillance around Target at the address. At approximately 1:32 p.m., I advised VILLAR-LUGO I was at Target. He requested a picture of my shoes and directed me to the bathroom inside the store.

32.  As I was walking into Target, I observed BAEZ also walking into Target with a Hispanic Male, later identified as Leidy Coronado GONZALEZ.  BAEZ was wearing a black winter jacket, backwards baseball cap and ripped jeans. GONZALEZ was wearing jeans and a tan colored sweatshirt and had dyed red hair.  At approximately 1:38 p.m., I entered the restroom

followed a short time later by BAEZ. While inside, I gave BAEZ $1,000.00 in OAF and in exchange BAEZ handed me the suspected fentanyl. Based upon my training and experience I recognized this substance to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. While in the restroom I also observed an unknown white male meet with BAEZ. I observed the white male give BAEZ money in exchange for an unknown substance. BAEZ, the white male, and I exited the bathroom and left the store shortly thereafter.

33.  At approximately 1:48 p.m., SA MacDonald observed BAEZ and GONZALEZ exit Target and walk to their vehicle, a black Honda CRV (MA Registration 2LNG35), which is registered to GONZALEZ. Both BAEZ and GONZALEZ were empty handed when they walked back to the car, indicating they had not made any purchases while inside. SA MacDonald reviewed the Target Security footage and confirmed that neither GONZALEZ nor BAEZ had made any purchases while inside. GONZALEZ also had stayed near the bathroom area in a suspected attempt at counter surveillance.

**Controlled Buy #7:**

34. On February 24, 2022, at approximately 6:21 p.m., I contacted VILLAR-LUGO via the Meta Messenger to purchase fentanyl. The conversation follows:

- UC: Hey bro can I come c u tonight
- VILLAR-LUGO: OK. LKM what you need
- UC: Aight I'm gonna leave Laconia area in a few I'll be there around 8 I'll hit you up when I'm close. $300.00
- VILLAR-LUGO: Perfect OK What time (@ 7:21 PM)
- UC: I'll be in Salem in 15 mins
- VILLAR-LUGO: OK 300$ you have yes?

- UC: Yes
- VILLAR-LUGO: 70 Pleasant Valley St Methuen, MA 01844  Estados Unidos-Walmart

35.  Members of the MDO, Massachusetts State Police, and SPD established surveillance around Walmart prior to me responding there. I was equipped with audio and video recording devices for this transaction.  At approximately 8:00 p.m., I arrived at Walmart and received a request from VILLAR-LUGO to send a picture of my shoes. I sent the picture and was directed to go into the bathroom at Walmart.

36.  At approximately 8:12 p.m., Sgt. Tirella observed the black CRV arrive in the parking lot, occupied by several people. Detective White observed the vehicle park on the east side of the Walmart lot. TFO White then observed BAEZ, wearing a red puffy jacket, black jeans and red shoes exit the vehicle and walk to the front of the Walmart.

37.  I entered the bathroom of Walmart and waited several minutes. At approximately 8:15 p.m., I observed BAEZ enter the bathroom. BAEZ gave me the suspected fentanyl over the bathroom stall and in exchange I gave BAEZ $300.00 in OAF. Based upon my training and experience I recognized this substance to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. As BAEZ left the bathroom, I was able to capture him on video.

38. At about the same time, TFO Hamel observed BAEZ exit the bathroom while talking on the phone. BAEZ met GONZALEZ and HF2 inside the store. Both HF2 and GONZALEZ have been present during previous controlled purchases, apparently acting as lookouts for the DTO. At approximately 8:20 p.m., TFO O'Connor observed BAEZ, GONZALEZ and HF2 waiting in line

at the checkout. Approximately one minute later, they walked out the door and back towards their vehicle and eventually departed the area.

## Agents Identify GONZALEZ and BAEZ:

39.  On March 3, 2022, members of the MDO set up surveillance on the CRV at 70 Union Street, Methuen, MA. At approximately 11:40 a.m., SA MacDonald and I observed GONZALEZ and BAEZ exit the residence and enter the vehicle. They traveled northbound through Methuen, towards New Hampshire. At the request of SA MacDonald, Methuen Police Officer Tardiff conducted a motor vehicle stop on the CRV to identify the occupants. During the stop, the driver identified herself as Leidy Coronado GONZALEZ of 70 Union Street, Apt 5, Methuen, MA. The passenger identified himself as Angel BAEZ of the Dominican Republic.

## DTOs Use of Meta (Facebook) Accounts:

40.  I know in my investigative experience that drug traffickers often "friend" other co-conspirators and take photographs and post them to their Meta accounts. I also believe that this search warrant will allow agents to identify other co-conspirators not yet known to this investigation. I also know that drug traffickers will often attempt to contact drug customers through Meta. In my experience, traffickers believe they will be safer if they investigate a potential customer's social media presence prior to meeting face to face. Traffickers believe that if they see a stronger social media presence, the less likely the customer could be an undercover officer.

41.  A preservation request was served on Meta for the account associated with https://www.facebook.com/raldy.lara on October 13, 2021. Meta has indicated that it has taken reasonable steps to preserve this account.

42.  Meta Platforms Inc owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Meta allows its users to establish accounts with Meta, and users can then use their accounts to share written news, photographs, videos, and other information with other Meta users, and sometimes with the general public.

43.  Meta asks users to provide basic contact and personal identifying information to Meta, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Meta passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Meta also assigns a user identification number to each account.

44.  Meta users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Meta assigns a group identification number to each group. A Meta user can also connect directly with individual Meta users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Meta and can exchange communications or view information about each other. Each Meta user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

45.  Meta users can select different levels of privacy for the communications and information associated with their Meta accounts. By adjusting these privacy settings, a Meta user can make information available only to himself or herself, to particular Meta users, or to anyone with access to the Internet, including people who are not Meta users. A Meta user can also create "lists" of Meta friends to facilitate the application of these privacy settings. Meta accounts also

include other account settings that users can adjust to control, for example, the types of notifications they receive from Meta.

46.   Meta users can create profiles that include photographs, lists of personal interests, and other information. Meta users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Meta users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Meta users can "check in" to particular locations or add their geographic locations to their Meta posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

47.   Meta allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Meta users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Meta's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

48.   Meta users can exchange private messages on Meta with other users. Those messages are stored by Meta unless deleted by the user. Meta users can also post comments on the Meta profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Meta has a chat feature that allows users to send and receive instant messages through Meta Messenger. These chat communications are

stored in the chat history for the account. Meta also has Video and Voice Calling features, and although Meta does not record the calls themselves, it does keep records of the date of each call.

49.  If a Meta user does not want to interact with another user on Meta, the first user can "block" the second user from seeing his or her account.

50.  Meta has a "like" feature that allows users to give positive feedback or connect to particular pages. Meta users can "like" Meta posts or updates, as well as webpages or content on third-party (i.e., non-Meta) websites.

51.  Meta has a search function that enables its users to search Meta for keywords, usernames, or pages, among other things.

52.  Each Meta account has an activity log, which is a list of the user's posts and other Meta activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Meta page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Meta page.

53.  Meta also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

54.  In addition to the applications described above, Meta also provides its users with access to thousands of other applications ("apps") on the Meta platform. When a Meta user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

55. Meta also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Meta, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Meta profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

56. Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Meta users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

57. As explained herein, information stored in connection with a Meta account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Meta user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Meta account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and

tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Meta account at a relevant time. Further, Meta account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.

58. Such information allows investigators to understand the geographic and chronological context of Meta access, use, and events relating to the crime under investigation. Additionally, Meta builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Meta "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Meta account owner. Last, Meta account activity may provide relevant insight into the Meta account owner's state of mind as it relates to the offense under investigation. For example, information on the Meta account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

59. Therefore, the computers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Meta, such as account access information, transaction information, and other account information.

/s/ John Hannigan
John Hannigan, Task Force Officer
Drug Enforcement Administration


The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim.

P. 4.1 and affirmed under oath the content of this affidavit and application.


Date: **Mar 16, 2022**

Time: **1:41 PM, Mar 16, 2022**

HONORABLE  ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with the Meta (Facebook) account associated with the account www.facebook.com/raldy.lara that is stored at premises owned, maintained, controlled, or operated by Meta Inc., a company headquartered in Menlo Park, California.

# Attachment B

## Particular Things to be Seized

**Information to be disclosed by Meta**

For the time period from October 13, 2021 to the present, to the extent that the information described in Attachment A is within the possession, custody, or control of Meta Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to thegovernment for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing theuser's posts and other Meta activities;

(c)     All photos and videos uploaded by that user ID and all photos andvideos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Meta user identification numbers; groups and networks of which the user is a member, including the groups' Meta group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Meta applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique deviceidentifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages madeor received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged intothe account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that theuser has "liked";

2

(j)    All information about the Meta pages that the account is or was a "fan" of;

(k)    All past and present lists of friends created by the account;

(l)    All records of Meta searches performed by the account;

(m)    All information about the user's access and use of Meta Marketplace;

(n)    The types of service utilized by the user;

(o)    The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)    All privacy settings and other account settings, including privacy settings for individual Meta posts and activities, and all records showing which Meta users have been blocked by the account;

(q)    All records pertaining to communications between Meta and any person regarding the user or the user's Meta account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within **14 days** of issuance of this warrant.

3

## II.   **Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidenceand instrumentalities of violations of 21 U.S.C. § 841 (distribution of controlled substances and possession with intent to distribute controlled substances), 21

U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances), and 21 U.S.C. § 843(b) (unlawful use of a communication facility) involving Melvin VILLAR-LUGO since October 13, 2021, including, for each user identified on Attachment A, information pertaining to thefollowing matters:

(a) The unlawful acquisition, possession or distribution of controlledsubstances and the unlawful use of a communication facility;

(b) Evidence indicating how and when the Meta account was accessedor used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Meta account owner's state of mind as itrelates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, includingrecords that help reveal the whereabouts of such person(s).

(e) The identity of person(s) who communicated with the user aboutmatters relating to the acquisition, possession, or distribution ofcontrolled substances.

# EXHIBIT 2

# (22-mj-103-AJ)

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF | **)  No.  22-mj -103-AJ** |
| INFORMATION PERTAINING TO THE | **)** |
| META (FACEBOOK) ACCOUNT | **)** |
| WWW.FACEBOOK.COM/RALDY.LARA | **)  FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Task Force Officer John Hannigan being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of an application for a search warrant for information associated with a certain Meta account that is stored at premises owned, maintained, controlled, or operated by Meta Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with Meta.com/raldy.lara.

2.  I am a police officer employed by the Nashua Police Department (NPD since 2010. In September 2019, I transferred to NPD's Narcotics Intelligence Division, where I conducted investigations into narcotics-related offenses. Since August 2021, I have served as a Task Force Officer (TFO) to the Drug Enforcement Administration (DEA) Strike Force, Manchester, New

Hampshire District Office. I have attended narcotics and criminal investigation training classes administered by the New Hampshire Police Standards and Training Council, the DEA, the Northeast Counterdrug Training Center, as well as by the NPD.

3. As a DEA TFO, I am authorized to investigate violations of the laws of the United States, including violations of the federal drug laws and money laundering laws in Title 21 and Title 18, respectively, of the United States Code. " I am a Federal Law Enforcement Officer within the meaning of Federal Rule of Criminal Proceeding 41 (a)(2)(C), that is , a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a Search Warrant.

4. Through my training, education, and experience, I have become generally familiar with the way drug trafficking organizations ("DTOs") conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. I have participated in the execution of numerous search warrants resulting in the seizure of large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances; United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants and executing arrests.

5.  Based on my training and experience, I am familiar with the methods of operation employed by narcotics traffickers. I am aware that some narcotics traffickers utilize other means of electronic communication – including the Meta Platforms Inc messenger application in support of their trafficking. I am also aware that narcotics traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

      a.     my experience investigating drug-trafficking offense

      b.     oral and written reports and documents about this investigation that I have received from members of the DEA, local law enforcement, and other federal law enforcement agencies;

      c.     discussions I have had personally concerning this investigation with experienced narcotics investigators;

      d.     physical and fixed camera surveillance conducted by the DEA and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

      e.     public records and law enforcement databases;

      f.     telephone toll records, pen register and trap and trace information, and telephone subscriber information; and

      g.     geolocation information.

6.  Unless otherwise indicated, the statements contained herein are summaries of information that I have received from other law enforcement officers, and I specifically relied on oral reports from other law enforcement officers. When information is based on my personal knowledge or conclusion, it will be so stated.

7.  Since this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of a search warrant, I have not included details about every aspect of the investigation. While this affidavit contains all the material information I am aware

of that is pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

8.  Based on the facts set forth in this affidavit, I submit that there is probable cause to believe, and I do believe, that Melvin VILLAR-LUGO and others known and unknown have committed, are committing, and will continue to commit violations of 21 U.S.C. § 841 (distribution of controlled substances and possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances), and 21 U.S.C. § 843(b) (unlawful use of a communication facility). There is also probable cause to search the information described in Attachment A for evidence of these crimes as described in Attachment B.

## CONFIDENTIAL SOURCE INFORMAITON (CS-1)

9.  Agents of the DEA and local officers have received information concerning the illegal drug trafficking activities of the Raldy Drug Trafficking Organization (Raldy DTO) from a confidential source. Pertinent to this investigation, agents have been receiving information from Confidential Source 1 (CS-1) regarding the drug trafficking activities of this DTO.

10.  CS-1 began providing information to agents on or about October 6, 2021.  CS-1's cooperation was in exchange for potential consideration in a pending New Hampshire state charge for possession of a controlled drug with intent to distribute.  In return for CS-1's cooperation in this case, agents have made no promises, nor did agents offer compensation or any other consideration. CS-1 has an extensive criminal history, including convictions for possession of a class A and B drugs, distribution of a class A and B drugs, Conspiracy to violate the controlled substance act and possession of a controlled substance within a school zone.

11. According to CS-1, CS-1 had a pre-existing drug-trafficking relationship with a Dominican drug trafficking organization led by an individual known as "Raldy".  CS-1 stated that it had been purchasing fentanyl from Raldy and his co-conspirators for approximately two years.  CS-1 stated that initially contacted Raldy through telephone number 978-881-8989 and also the Meta account (Formerly Facebook) of "Raldy.Lara." CS-1 told agents that arranged fentanyl purchases with Raldy and then traveled to a location designated by Raldy. CS-1 then met a "runner" (an individual tasked with delivering the drugs) in a public area to complete the exchange. CS-1 stated that a typical drug transaction occurred in the bathroom of a business or through the window of his car on a residential street in Lawrence or Methuen. CS-1 stated that it had done drug transactions with between 8-10 different "runners" over the course of its business with Raldy and his organization. CS-1 also stated that in the past approximately six months, it had primarily been in communication with Raldy via the Meta account https://www.facebook.com/raldy.lara. CS-1 stated that it did not believe the 978-881-8989 telephone was still being used.

12.  CS-1 conducted a controlled purchase of fentanyl from the Raldy DTO in October and January of 2021. These purchases will be detailed further in this affidavit. Additionally, in January of 2022, CS-1 successfully introduced an undercover agent into the Raldy DTO. Since the introduction of the undercover agent, the use of CS-1 has no longer been necessary.

13.  All information from CS-1 that could be corroborated by agents has proven true and accurate. For example, agents confirmed historical information provided by CS-1 through open source searches, social media searches, review of photographs, and review of police records.  In addition, toll records and photographs of call logs and text messages were used to verify contacts between CS-1 and the https://www.facebook.com/raldy.lara Meta account. To my knowledge,

CS-1 has never provided misleading or incorrect information to any law enforcement officer. For these reasons, I consider CS-1's information related to this investigation to be credible and reliable.

## PROBABLE CAUSE

14.  In October 2021 members of the Salem, New Hampshire Police Department (SPD) generated a confidential source, referred to as CS-1, who provided information into a Drug Trafficking Organization (DTO) based in Lawrence, Massachusetts. The CS advised this organization is utilizing the Meta (formerly Facebook) Account "Raldy Lara" to complete their narcotics transactions. I reviewed this account identified as https://facebook.com/raldy.lara. This account does not contain any personal information and appears to be created as a means of communication via the Meta Messenger application. During the investigation the subject operating the "Raldy Lara" Meta Account contacted me while I was operating in an undercover capacity. During this conversation I was able to capture an image of the male's face. This male is believed to be Melvin VILLAR-LUGO. The name "Raldy" is believed to be an alias of VILLAR-LUGO. Further explanation into this identification will be explained later in the affidavit to keep the series of events in chronological order.

**Controlled Buy #1:**

15.  On October 6, 2021, at the direction of Detective Lucas White from SPD, CS-1 contacted VILLAR-LUGO via the Meta Account "Raldy Lara" to purchase a quantity of fentanyl. The resulting conversation was as follows:

- CS-1: Hey can I come see you Ill be there around 5 if that's ok.
- VILLAR-LUGO: Yes what you nees?

- CS-1: I got $750.00
- VILLAR-LUGO: ok.ok.

16.  At approximately 4:30 p.m., Detective White, Special Agent (SA) MacDonald, and TFO Mansi met with CS-1 at a predetermined meeting location. Due to CS-1 not having a license, CS-1's significant other agreed to drive CS-1 to the anticipated deal.  CS-1, its significant other, and the vehicle were searched for contraband with negative results. CS-1 was given $750 in official advanced funds (OAF) and outfitted with recording/transmitting equipment. CS-1 was then instructed by Detective White to place a text to the target that read "I am almost there, I have 750."  At that point, the SPD detectives followed CS-1 in its vehicle to the McDonald's located at 235 South Broadway, Salem, NH as instructed.

17.  At approximately 4:54 p.m., the conversation via the Meta Account continued:

- VILLAR-LUGO: Salem, NH
- VILLAR-LUGO: my boy
- CS-1-: Yeah
- VILLAR-LUGO: ok, ok
- CS-1: Thank you

At approximately 5:08 p.m., CS-1 texted the target asking how long until he reached the McDonalds. The Target replied that he was on his way. At approximately 5:35 p.m., CS-1 again texted the target and asked for its location. The Target said that he was almost there and that there was traffic. CS-1 then had the following exchange with the Target:

- VILLAR-LUGO:  go to marshall, wall, walk
- CS-1: Oh ok
- VILLAR-LUGO:  lkm, in here now
- CS-1: Ok im walking over, I was at mcdonalds
- VILLAR-LUGO:  im bathroom marhall now, lkm, when you there

- • CS-1: Ok bro im almost there
- • VILLAR-LUGO:  what schoes you have, shoes
- • CS-1: Here now, only 2 stalls, im in the end with boots black.

At that same time, SA MacDonald observed CS-1 exit its car and walk towards the Marshalls store.

18.  At approximately 6:04 p.m., SA MacDonald observed CS-1 enter the front door of the Marshalls. At that time, TFO Mansi observed CS-1 walk inside and enter the bathroom of the Marshalls. At approximately 6:04 p.m., CS-1 texted the target:

- • CS-1: Im here now
- • VILLAR-LUGO:  go bathroom
- • CS-1: ill be there in a minute, im sorry
- • VILLAR-LUGO:  ok
- • CS-1: Im in the bathroom now
- • VILLAR-LUGO:  ok

At approximately 6:07 p.m., TFO Mansi observed CS-1 exit the bathroom and walk out of the front door of Marshalls. SA MacDonald and Detective White observed CS-1 walk back towards its car and return to the neutral location for debriefing. Approximately one minute after CS-1 exited the bathroom, TFO Mansi observed a Hispanic male, herein referred to as (HM1) with a black shirt, black hat and a ponytail exit the bathroom and walk to the front area of the store. Approximately one minute later, HM1 exited the Marshalls and walked south toward the Home Depot.  Surveillance units attempted to follow HM1 but he was picked up by a taxi service and surveillance was terminated. At this time in the investigation HM1 has not been identified.

19.  After CS-1 completed the deal, it was followed back to a neutral location where it immediately surrendered the suspected fentanyl. Based upon both Detective White and SA MacDonald's training and experience they recognized this substance relinquished by CS-1 to be

consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. CS-1 and its significant other were searched by law enforcement for contraband with negative results.  CS-1 confirmed that it had purchased the drugs in the bathroom from HM1, who was a Hispanic male with a ponytail and hat.

**Controlled Buy #2:**

20.  On January 25, 2022, Detective White and I contacted CS-1 to set up a controlled purchase of fentanyl from VILLAR-LUGO. At approximately 12:52 p.m., CS-1 contacted VILLAR-LUGO via the Meta Account "Raldy Lara." During the conversation, CS-1 was instructed to introduce an undercover officer via the Meta account to the DTO. A synopsis of the conversation follows:

- CS-1: Hey I'm coming down today bro. It'll be later like 5ish.
- VILLAR-LUGO: Ok good
- VILLAR-LUGO: What you need when you come
- CS-1: Hey I'll be there within an hour. I have 300
- VILLAR-LUGO: Ok
- CS-1: I'll go to Plaza in Methuen. I got one of my boys with my I said I'd hook you up with
- VILLAR-LUGO: Yes
- CS-1: Johnny trappz, he's on my Facebook.
- VILLAR-LUGO: Ok Perfect

As the conversation progressed CS-1 was directed to 170 Haverhill Street, Dollar Tree, Methuen, MA. Prior to the transaction, Detective White and I searched CS-1.  CS-1 was clear of any drugs, money, or contraband. CS-1 was provided with $300.00 in OAF to complete the transaction. Prior to the transaction, members of the MDO and SPD established surveillance in the area.

Acting in an undercover capacity I transported CS-1 to the Dollar Tree. CS-1 was directed to go inside while I waited in the vehicle. Under surveillance, CS-1 went into the Dollar Tree and a short time later returned to the UC vehicle because CS-1 could not locate the dealer. CS-1 again contacted VILLAR-LUGO via the Meta application and was directed to go back into the Dollar Tree. CS-1 entered the Dollar Tree and returned to me a short time later. CS-1 provided me with suspected fentanyl and information about the transaction. Based upon my training and experience I recognized the substance that CS-1 provided to me to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. CS-1 stated CS-1 met with an unknown Hispanic Male, later identified as Angel BAEZ, while in the Dollar Tree. BAEZ provided CS-1 with the suspected fentanyl packaged in a plastic bag. In exchange, CS-1 provided the male with $300.00 in OAF. Members of surveillance were able to follow this male to 97-99 Market Street Lawrence, MA. The identity of BAEZ was determined during a motor vehicle stop detailed later in this affidavit.

**<u>Controlled Buy #3:</u>**

21.  On January 31, 2022, at approximately 1:00 p.m., acting in an undercover capacity, I sent a message to the "RALDY Lara" Meta account via the messenger application to purchase a quantity of fentanyl. A synopsis of the conversation follows:

- UC: Can I come see you
- VILLAR-LUGO: Yes
- VILLAR-LUGO: LKM
- UC: Aight I will be in Salem in half hour
- VILLAR-LUGO: What you need
- UC: $300
- VILLAR-LUGO: Ok

22.  At approximately 2:15 p.m., I received a video phone call from the same Meta account "RALDY Lara." I answered the call and spoke with a heavy-set Hispanic Male, later identified as VILLAR-LUGO. The conversation lasted approximately 6 seconds and I advised VILLAR-LUGO that I had $300.00. I was unable to capture an image of VILLAR-LUGO during this conversation.

23.  At approximately 2:58 p.m., VILLAR-LUGO contacted me using the Meta application and directed me to Home Depot, 72 Pleasant Valley Street, Methuen, MA. A synopsis of the conversation follows:

- VILLAR-LUGO: 72 Pleasant Valley St Methuen, MA 01844 Estados Unidos
- Me: ok ty I'll be there in 15
- VILLAR-LUGO: Here now Lkm
- ME: Ok almost there
- VILLAR-LUGO: the second toilet enters the bathroom

24.  At approximately 3:21 p.m., I entered the restrooms in Home Depot and met a Hispanic Male, later identified as BAEZ. BAEZ handed me suspected fentanyl and in exchange I gave him $300.00 in OAF.  Based upon my training and experience I recognized this substance to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. BAEZ took the money and left the bathroom. I followed BAEZ out of the Home Depot where he entered a taxicab and left the area.

**Controlled Buy #4**

25.  On February 2, 2022, at approximately 12:03 p.m., acting in an undercover capacity, I again used the Meta Account "Raldy Lara" to negotiate to purchase a quantity of fentanyl. A synopsis of the conversation follows:

- UC: Hey can I come see yo
- VILLAR-LUGO: What you need
- UC: $300
- VILLAR-LUGO: Ok good
- VILLAR-LUGO: 186 Haverhill St Methuen, MA- Home Depot

26. Prior to my arrival at the address, members of the MDO and SPD established surveillance there. Upon arrival at the location, I noted there was no Home Depot as anticipated. I subsequently video-called on the Meta account for further instructions. VILLAR-LUGO answered the call. I noted he was the same male with whom I spoke on the video-call prior to the undercover purchase on January 31, 2022. VILLAR-LUGO instructed me to go into the Market Basket at that location and enter the bathroom to meet with his "runner." I affirmed and VILLAR-LUGO ended the call.

27. A few minutes after the call, I entered the restroom and remained in a toilet stall awaiting further instructions. While in the bathroom I met with BAEZ, the same male with whom I had completed the prior undercover purchase on January 31, 2022. Due to other individuals in the bathroom, we did not complete the transaction there. Instead, I followed BAEZ to an aisle in the store where I watched him leave the suspected fentanyl on a store shelf. I then showed BAEZ the money and left it behind other items on the shelf. I collected the suspected fentanyl and BAEZ took the $300.00 in OAF. Based upon my training and experience I recognized this substance to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. I also observed an unidentified Hispanic female with him, herein referred to as HF2. Members of surveillance team followed BAEZ and HF2 back to their residence at 97-99 Market Street, Lawrence, MA after the transaction.

**Agents Identification of VILLAR-LUGO**

28.  During the video call referenced above, I was able to covertly record VILLAR-LUGO during the call. I showed this photograph to multiple agents.  SA Doud recognized the male from a prior investigation and advised that he believed this male to be VILLAR-LUGO based upon a prior investigation he conducted. After speaking with SA Doud and reviewing his report the following information is a synopsis on his identification of VILLAR-LUGO:

- In June of 2019 SA Doud received information from Officer Scott Powers of the Littleton, NH Police Department that a Hispanic male who goes by the name "Raldy" is actively selling fentanyl in Lawrence, MA. This male was identified as VILLAR-LUGO, which will be explained further. SA Doud was provided with a phone number for VILLAR-LUGO, which he began to converse with in order to set up an undercover purchase of fentanyl.

- On August 5, 2019 VILLAR-LUGO agreed to meet SA Doud at the Rockingham Mall, Salem, NH. SA Doud met with VILLAR-LUGO who provided SA Doud with a sample of approximately 15 grams of fentanyl and the two ended their contact.

- Surveillance was conducted on VILLAR-LUGO following the transaction and TFO Day- Lewis observed VILLAR-LUGO enter in a Honda Accord, MA Registration 8XE733. A query of this registration revealed this car was registered to Melvin VILLAR-LUGO (DOB 08/19/1998). SA Doud and TFO Day-Lewis later reviewed an RMV photograph of VILLAR-LUGO and confirmed he was the same male that provided SA Doud with the sample of fentanyl. As noted above VILLAR-LUGO was also operating under the name "Raldy" which is the same name he is using in this current investigation.

- I also reviewed the photograph of VILLAR-LUGO and noted he was the same male I had covertly recorded on Controlled Buy #4.

**Controlled Buy #5:**

29.  On February 7, 2022, at approximately 1:22 p.m., I sent a message to the Meta Account "Raldy Lara" to buy a quantity of fentanyl. A synopsis of the conversation follows:

- UC: Hey yo can I come see you
- VILLAR-LUGO: Yes
- UC: Only got $250 today
- VILLAR-LUGO: Ok come
- UC: Ok on my way
- VILLAR-LUGO: Go 39 Foster Street Lawrence.

As the conversation progressed, VILLAR-LUGO asked what vehicle I was driving. I described my Ford Escape SUV to VILLAR-LUGO, and he confirmed that his "runner" was on his way. Law enforcement then established surveillance in the area.

30.  At approximately 2:40 p.m., law enforcement observed BAEZ exit his house at 97-99 Market Street and walk to the area of 39 Foster Street. At 2:50 p.m. I parked in front of 39 Foster Street. I advised VILLAR-LUGO I had arrived at the location, and he informed me "30 segunds." A short time later I observed BAEZ, the same male with whom I had done the prior transactions, approach my driver's side window.  I gave him $250.00 in OAF and in exchange he provided me with suspected fentanyl. Based upon my training and experience I recognized this substance to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. BAEZ then walked back in the direction of his house. On March 2, 2022, I received the DEA lab results for the suspected

fentanyl, which indicated the substance purchased was positive for fentanyl. The lab indicated the weight of the fentanyl was 20.132 grams.

**Controlled Buy #6:**

31.  On February 14, 2022, 11:27 a.m., I contacted VILLAR-LUGO on the Meta application to arrange an undercover purchase of fentanyl. The conversation follows:

- UC: Hey Bro. Can I come see you.
- VILLAR-LUGO: Hey When
- UC: I can be down there in like an hour
- VILLAR-LUGO: Perfect Yes
- UC: Still good for the 10 sticks. I got 1,000
- VILLAR-LUGO: Really. Wtf. Why. hahahaha
- UC: I got customers now!
- VILLAR-LUGO: Ok. My brother
- UC: I thought we talked about it last week about it sorry bro
- R: No problem. And ready for you. Ok

As the conversation progressed, I was directed to Home Depot, 72 Pleasant Valley Street, Methuen, MA. Several minutes later I received another message stating, "67 Pleasant Valley St Methuen, MA, Target is better."  Members of the MDO and SPD established surveillance around Target at the address. At approximately 1:32 p.m., I advised VILLAR-LUGO I was at Target. He requested a picture of my shoes and directed me to the bathroom inside the store.

32.  As I was walking into Target, I observed BAEZ also walking into Target with a Hispanic Male, later identified as Leidy Coronado GONZALEZ.  BAEZ was wearing a black winter jacket, backwards baseball cap and ripped jeans. GONZALEZ was wearing jeans and a tan colored sweatshirt and had dyed red hair.  At approximately 1:38 p.m., I entered the restroom

followed a short time later by BAEZ. While inside, I gave BAEZ $1,000.00 in OAF and in exchange BAEZ handed me the suspected fentanyl. Based upon my training and experience I recognized this substance to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. While in the restroom I also observed an unknown white male meet with BAEZ. I observed the white male give BAEZ money in exchange for an unknown substance. BAEZ, the white male, and I exited the bathroom and left the store shortly thereafter.

33.  At approximately 1:48 p.m., SA MacDonald observed BAEZ and GONZALEZ exit Target and walk to their vehicle, a black Honda CRV (MA Registration 2LNG35), which is registered to GONZALEZ. Both BAEZ and GONZALEZ were empty handed when they walked back to the car, indicating they had not made any purchases while inside. SA MacDonald reviewed the Target Security footage and confirmed that neither GONZALEZ nor BAEZ had made any purchases while inside. GONZALEZ also had stayed near the bathroom area in a suspected attempt at counter surveillance.

**Controlled Buy #7:**

34. On February 24, 2022, at approximately 6:21 p.m., I contacted VILLAR-LUGO via the Meta Messenger to purchase fentanyl. The conversation follows:

- UC: Hey bro can I come c u tonight
- VILLAR-LUGO: OK. LKM what you need
- UC: Aight I'm gonna leave Laconia area in a few I'll be there around 8 I'll hit you up when I'm close. $300.00
- VILLAR-LUGO: Perfect OK What time (@ 7:21 PM)
- UC: I'll be in Salem in 15 mins
- VILLAR-LUGO: OK 300$ you have yes?

- UC: Yes
- VILLAR-LUGO: 70 Pleasant Valley St Methuen, MA 01844  Estados Unidos-Walmart

35.  Members of the MDO, Massachusetts State Police, and SPD established surveillance around Walmart prior to me responding there. I was equipped with audio and video recording devices for this transaction.  At approximately 8:00 p.m., I arrived at Walmart and received a request from VILLAR-LUGO to send a picture of my shoes. I sent the picture and was directed to go into the bathroom at Walmart.

36.  At approximately 8:12 p.m., Sgt. Tirella observed the black CRV arrive in the parking lot, occupied by several people. Detective White observed the vehicle park on the east side of the Walmart lot. TFO White then observed BAEZ, wearing a red puffy jacket, black jeans and red shoes exit the vehicle and walk to the front of the Walmart.

37.  I entered the bathroom of Walmart and waited several minutes. At approximately 8:15 p.m., I observed BAEZ enter the bathroom. BAEZ gave me the suspected fentanyl over the bathroom stall and in exchange I gave BAEZ $300.00 in OAF. Based upon my training and experience I recognized this substance to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. As BAEZ left the bathroom, I was able to capture him on video.

38. At about the same time, TFO Hamel observed BAEZ exit the bathroom while talking on the phone. BAEZ met GONZALEZ and HF2 inside the store. Both HF2 and GONZALEZ have been present during previous controlled purchases, apparently acting as lookouts for the DTO. At approximately 8:20 p.m., TFO O'Connor observed BAEZ, GONZALEZ and HF2 waiting in line

at the checkout. Approximately one minute later, they walked out the door and back towards their vehicle and eventually departed the area.

## Agents Identify GONZALEZ and BAEZ:

39.  On March 3, 2022, members of the MDO set up surveillance on the CRV at 70 Union Street, Methuen, MA. At approximately 11:40 a.m., SA MacDonald and I observed GONZALEZ and BAEZ exit the residence and enter the vehicle. They traveled northbound through Methuen, towards New Hampshire. At the request of SA MacDonald, Methuen Police Officer Tardiff conducted a motor vehicle stop on the CRV to identify the occupants. During the stop, the driver identified herself as Leidy Coronado GONZALEZ of 70 Union Street, Apt 5, Methuen, MA. The passenger identified himself as Angel BAEZ of the Dominican Republic.

## Controlled Buy #8

40.  On March 9, 2022 at approximately 10:10 a.m., I contacted VILLAR-LUGO via the Meta Messenger application to purchase fentanyl. The conversation was as follows:

- UC: Yo

- VILLAR-LUGO: yo

- UC: My messenger is all fucked up but I'm trying to come see you did you get my text on the number

- VILLAR-LUGO: Come an ready. (608) 579-9202. This is my number

- UC: 6179256584 is me ok

- VILLAR-LUGO: OK. Perfct

41.  At approximately 11:28 p.m., I placed a phone call to the number provided by VILLAR-LUGO, 6179256584. During the conversation I spoke with a male whom I believed to be VILLAR-LUGO who asked me what I needed. I advised him I had $250.00 to which he responded "ok." VILLAR-LUGO advised he would send me an address in the next 30 minutes to facilitate the transaction.

42.  At approximately 12:22 p.m., I continued my conversation with VILLAR-LUGO via the Facebook Messenger Application. The conversation was as follows:

- UC: Hey I will be there in 20 mins
- VILLAR-LUGO: 70 Pleasant Valley St Methuen, MA 01844 Estados Unidos. Walmart Methuen
- UC: Ok 20 mins
- VILLAR-LUGO: send picture of your shoes. Go to bathroom

43.  At approximately 12:45 p.m., members of the DEA and SPD established surveillance in the area of Walmart. At approximately 1:05 p.m., I entered Walmart and responded to the bathroom as instructed by VILLAR-LUGO. A short time later I observed Baez enter the bathroom stall next to me. Once in the stall Baez provided me with the suspected fentanyl and in exchange I provided him with $250.00 in OAF. I subsequently left Walmart and ended my contact with Baez.

**Meta Warrant Completion**

44.  On March 16, 2022 I completed a search warrant and supporting affidavit for the https://www.facebook.com/raldy.lara Meta account. The search warrant was subsequently granted by the Honorable Judge Andrea K. Johnstone and uploaded to Meta.

**Controlled Buy #9**

45.  On March 24, 2022 at approximately 1:24 p.m., I contacted VILLAR-LUGO via the phone number (608) 579-9202 to purchase fentanyl. The conversation was as follows:

- UC: Yooo can I cone see you
- VILLAR-LUGO: Uou. Yes and ready have fire (based upon my training and experience I know "Fire" to be a term for potent fentanyl).
- UC: My man. You do like 25g for 300?
- VILLAR-LUGO: ok come
- UC: wont be there until like 3-330 in Laconia ill let u know
- VILLAR-LUGO: Perfct ok

46.  At approximately 2:28 p.m., I advised VILLAR-LUGO I was in the area of

Methuen/Lawrence, MA. VILLAR-LUGO directed me to respond to Burger King, 95 Pleasant

Valley Street, Methuen, MA and instructed me to go to the bathroom.

47.  Members of the DEA subsequently established surveillance in the area of Burger King. At

approximately 2:51 p.m., I arrived at Burger King and responded to the bathroom. Once inside I

made contact with a male whom I immediately recognized to be Albert VENTURA. VENTURA

is known to me through prior contacts and was arrested by the DEA several months prior.

VENTURA provided me with the suspected fentanyl and in return I provided him with the

$300.00 in OAF. I then left the bathroom and ended my contact with VENTURA. VENTURA

was later seen entering into the Honda CRV registered to him.

**Meta Warrant Review**

48.  On April 8, 2022 I received the requested information on the search warrant from Meta. SA

MacDonald and I reviewed the account information and it was evident the account was being

used to distribute narcotics. With assistance from DEA analysts we were able to identify over

100 customers of this DTO that are using the Meta Messenger Application to complete narcotics

transactions. A thorough review of individual conversations between customers and the DTO

was completed. The results of this review is there have been over 8 kilograms of fentanyl

distributed to multiple customers from this DTO. In addition to the fentanyl there were also two

firearms sold to the DTO utilizing the Meta Messenger Application. The narcotics transactions

were consistent from October to March 16 (expiration of the search warrant information)

indicating the account is still actively being used by this DTO.

49.  After further review of the information provided by Meta the Visa Card 411770-XX-

XXXX-5311 was shown to be associated with this account. Based upon my training

and experience I know DTO's frequently send and receive money through various

online platforms. Any transaction history associated with the Facebook Account would provide further information into the inner-workings of this DTO and further assist with identifying other involved individuals.

**DTOs Use of Meta (Facebook) Accounts:**

50.  I know in my investigative experience that drug traffickers often "friend" other co-conspirators and take photographs and post them to their Meta accounts. I also believe that this search warrant will allow agents to identify other co-conspirators not yet known to this investigation. I also know that drug traffickers will often attempt to contact drug customers through Meta. In my experience, traffickers believe they will be safer if they investigate a potential customer's social media presence prior to meeting face to face. Traffickers believe that if they see a stronger social media presence, the less likely the customer could be an undercover officer.

51.  A preservation request was served on Meta for the account associated with https://www.facebook.com/raldy.lara on October 13, 2021. Meta has indicated that it has taken reasonable steps to preserve this account.

52.  Meta Platforms Inc owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Meta allows its users to establish accounts with Meta, and users can then use their accounts to share written news, photographs, videos, and other information with other Meta users, and sometimes with the general public.

53.  Meta asks users to provide basic contact and personal identifying information to Meta, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Meta passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Meta also assigns a user identification number to each account.

54.  Meta users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Meta assigns a group identification number to each group. A Meta user can also connect directly with individual Meta users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Meta and can exchange communications or view information about each other. Each Meta user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

55.  Meta users can select different levels of privacy for the communications and information associated with their Meta accounts. By adjusting these privacy settings, a Meta user can make information available only to himself or herself, to particular Meta users, or to anyone with access to the Internet, including people who are not Meta users. A Meta user can also create "lists" of Meta friends to facilitate the application of these privacy settings. Meta accounts also

include other account settings that users can adjust to control, for example, the types of notifications they receive from Meta.

56.  Meta users can create profiles that include photographs, lists of personal interests, and other information. Meta users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Meta users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Meta users can "check in" to particular locations or add their geographic locations to their Meta posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

57.  Meta allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Meta users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Meta's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

58.  Meta users can exchange private messages on Meta with other users. Those messages are stored by Meta unless deleted by the user. Meta users can also post comments on the Meta profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Meta has a chat feature that allows users to send and receive instant messages through Meta Messenger. These chat communications are

stored in the chat history for the account. Meta also has Video and Voice Calling features, and although Meta does not record the calls themselves, it does keep records of the date of each call.

59.  If a Meta user does not want to interact with another user on Meta, the first user can "block" the second user from seeing his or her account.

60.  Meta has a "like" feature that allows users to give positive feedback or connect to particular pages. Meta users can "like" Meta posts or updates, as well as webpages or content on third-party (i.e., non-Meta) websites.

61.  Meta has a search function that enables its users to search Meta for keywords, usernames, or pages, among other things.

62.  Each Meta account has an activity log, which is a list of the user's posts and other Meta activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Meta page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Meta page.

63.  Meta also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

64.  In addition to the applications described above, Meta also provides its users with access to thousands of other applications ("apps") on the Meta platform. When a Meta user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

65.  Meta also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Meta, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Meta profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

66.  Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Meta users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

67.  As explained herein, information stored in connection with a Meta account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Meta user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Meta account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and

tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Meta account at a relevant time. Further, Meta account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.

68. Such information allows investigators to understand the geographic and chronological context of Meta access, use, and events relating to the crime under investigation. Additionally, Meta builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Meta "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Meta account owner. Last, Meta account activity may provide relevant insight into the Meta account owner's state of mind as it relates to the offense under investigation. For example, information on the Meta account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

69. Therefore, the computers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Meta, such as account access information, transaction information, and other account information.

/s/ John Hannigan
John Hannigan, Task Force Officer
Drug Enforcement Administration


The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim.

P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: **May 13, 2022**

Andrea K. Johnstone
United States Magistrate Judge

Time: **1:03 PM, May 13, 2022**

## <u>ATTACHMENT A</u>

### Property to Be Searched

This warrant applies to information associated with the Meta (Facebook) account associated with the account www.facebook.com/raldy.lara that is stored at premises owned, maintained, controlled, or operated by Meta Inc., a company headquartered in Menlo Park, California.

# Attachment B

## Particular Things to be Seized

**Information to be disclosed by Meta**

For the time period from March 16, 2022 to the present, to the extent that the information described in Attachment A is within the possession, custody, or control of Meta Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a) All contact and personal identifying information, full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b) All activity logs for the account and all other documents showing the user's posts and other Meta activities;

(c) All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Meta user identification numbers; groups and networks of which the user is a member, including the groups' Meta group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Meta applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged in to the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Meta pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Meta searches performed by the account;

(m)    All information about the user's access and use of Meta

        Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any

        payments associated with the service (including any credit card or bank

        account number); including any and all transactions associated with the

        Visa Card 411770-XX-XXXX-5311.

(p)     All privacy settings and other account settings, including privacy settings

        for individual Meta posts and activities, and all records showing which

        Meta users have been blocked by the account;

(q)     All records pertaining to communications between Meta and any

        person regarding the user or the user's Meta account, including

        contacts with support services and records of actions taken.

        Meta is hereby ordered to disclose the above information to

the government within **14 days** of issuance of this warrant.

3

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. § 841 (distribution of controlled substances and possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances), and 21 U.S.C. § 843(b) (unlawful use of a communication facility) involving Melvin VILLAR-LUGO since March 16, 2022, including, for each user identified on Attachment A, information pertaining to the following matters:

(a) The unlawful acquisition, possession or distribution of controlled substances and the unlawful use of a communication facility;

(b) Evidence indicating how and when the Meta account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Meta account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(e) The identity of person(s) who communicated with the user about matters relating to the acquisition, possession, or distribution of controlled substances.

# EXHIBIT 3

# (22-mj-188-01-AJ)

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION PERTAINING TO THE META (FACEBOOK) ACCOUNT WWW.FACEBOOK.COM/RALDY.LARA | ) **No. 22-mj**-188-01-AJ<br>)<br>)<br>) **FILED UNDER SEAL** |


**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Task Force Officer John Hannigan being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of an application for a search warrant for information associated with a certain Meta account that is stored at premises owned, maintained, controlled, or operated by Meta Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with Meta.com/raldy.lara.

2.  I am a police officer employed by the Nashua Police Department (NPD since 2010. In September 2019, I transferred to NPD's Narcotics Intelligence Division, where I conducted investigations into narcotics-related offenses. Since August 2021, I have served as a Task Force Officer (TFO) to the Drug Enforcement Administration (DEA) Strike Force, Manchester, New

Hampshire District Office. I have attended narcotics and criminal investigation training classes administered by the New Hampshire Police Standards and Training Council, the DEA, the Northeast Counterdrug Training Center, as well as by the NPD.

3.  As a DEA TFO, I am authorized to investigate violations of the laws of the United States, including violations of the federal drug laws and money laundering laws in Title 21 and Title 18, respectively, of the United States Code. " I am a Federal Law Enforcement Officer within the meaning of Federal Rule of Criminal Proceeding 41 (a)(2)(C), that is , a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a Search Warrant.

4.  Through my training, education, and experience, I have become generally familiar with the way drug trafficking organizations ("DTOs") conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. I have participated in the execution of numerous search warrants resulting in the seizure of large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances; United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants and executing arrests.

5.  Based on my training and experience, I am familiar with the methods of operation employed by narcotics traffickers. I am aware that some narcotics traffickers utilize other means of electronic communication – including the Meta Platforms Inc messenger application in support of their trafficking. I am also aware that narcotics traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

      a.     my experience investigating drug-trafficking offense

      b.     oral and written reports and documents about this investigation that I have received from members of the DEA, local law enforcement, and other federal law enforcement agencies;

      c.     discussions I have had personally concerning this investigation with experienced narcotics investigators;

      d.     physical and fixed camera surveillance conducted by the DEA and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

      e.     public records and law enforcement databases;

      f.     telephone toll records, pen register and trap and trace information, and telephone subscriber information; and

      g.     geolocation information.

6.  Unless otherwise indicated, the statements contained herein are summaries of information that I have received from other law enforcement officers, and I specifically relied on oral reports from other law enforcement officers. When information is based on my personal knowledge or conclusion, it will be so stated.

7.  Since this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of a search warrant, I have not included details about every aspect of the investigation. While this affidavit contains all the material information I am aware

of that is pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

8.  Based on the facts set forth in this affidavit, I submit that there is probable cause to believe, and I do believe, that Melvin VILLAR-LUGO and others known and unknown have committed, are committing, and will continue to commit violations of 21 U.S.C. § 841 (distribution of controlled substances and possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances), and 21 U.S.C. § 843(b) (unlawful use of a communication facility). There is also probable cause to search the information described in Attachment A for evidence of these crimes as described in Attachment B.

## CONFIDENTIAL SOURCE INFORMAITON (CS-1)

9.  Agents of the DEA and local officers have received information concerning the illegal drug trafficking activities of the Raldy Drug Trafficking Organization (Raldy DTO) from a confidential source. Pertinent to this investigation, agents have been receiving information from Confidential Source 1 (CS-1) regarding the drug trafficking activities of this DTO.

10.  CS-1 began providing information to agents on or about October 6, 2021.  CS-1's cooperation was in exchange for potential consideration in a pending New Hampshire state charge for possession of a controlled drug with intent to distribute.  In return for CS-1's cooperation in this case, agents have made no promises, nor did agents offer compensation or any other consideration. CS-1 has an extensive criminal history, including convictions for possession of a class A and B drugs, distribution of a class A and B drugs, Conspiracy to violate the controlled substance act and possession of a controlled substance within a school zone.

11. According to CS-1, CS-1 had a pre-existing drug-trafficking relationship with a Dominican drug trafficking organization led by an individual known as "Raldy".  CS-1 stated that it had been purchasing fentanyl from Raldy and his co-conspirators for approximately two years.  CS-1 stated that initially contacted Raldy through telephone number 978-881-8989 and also the Meta account (Formerly Facebook) of "Raldy.Lara." CS-1 told agents that arranged fentanyl purchases with Raldy and then traveled to a location designated by Raldy. CS-1 then met a "runner" (an individual tasked with delivering the drugs) in a public area to complete the exchange. CS-1 stated that a typical drug transaction occurred in the bathroom of a business or through the window of his car on a residential street in Lawrence or Methuen. CS-1 stated that it had done drug transactions with between 8-10 different "runners" over the course of its business with Raldy and his organization. CS-1 also stated that in the past approximately six months, it had primarily been in communication with Raldy via the Meta account https://www.facebook.com/raldy.lara. CS-1 stated that it did not believe the 978-881-8989 telephone was still being used.

12.  CS-1 conducted a controlled purchase of fentanyl from the Raldy DTO in October and January of 2021. These purchases will be detailed further in this affidavit. Additionally, in January of 2022, CS-1 successfully introduced an undercover agent into the Raldy DTO. Since the introduction of the undercover agent, the use of CS-1 has no longer been necessary.

13.  All information from CS-1 that could be corroborated by agents has proven true and accurate. For example, agents confirmed historical information provided by CS-1 through open source searches, social media searches, review of photographs, and review of police records.  In addition, toll records and photographs of call logs and text messages were used to verify contacts between CS-1 and the https://www.facebook.com/raldy.lara Meta account. This account has been identified by Meta as Target number 100041467633575. To my knowledge,

CS-1 has never provided misleading or incorrect information to any law enforcement officer. For these reasons, I consider CS-1's information related to this investigation to be credible and reliable.

## **PROBABLE CAUSE**

14.  In October 2021 members of the Salem, New Hampshire Police Department (SPD) generated a confidential source, referred to as CS-1, who provided information into a Drug Trafficking Organization (DTO) based in Lawrence, Massachusetts. The CS advised this organization is utilizing the Meta (formerly Facebook) Account "Raldy Lara" to complete their narcotics transactions. I reviewed this account identified as https://facebook.com/raldy.lara. This account does not contain any personal information and appears to be created as a means of communication via the Meta Messenger application. During the investigation the subject operating the "Raldy Lara" Meta Account contacted me while I was operating in an undercover capacity. During this conversation I was able to capture an image of the male's face. This male is believed to be Melvin VILLAR-LUGO. The name "Raldy" is believed to be an alias of VILLAR-LUGO. Further explanation into this identification will be explained later in the affidavit to keep the series of events in chronological order.

**Controlled Buy #1:**

15.  On October 6, 2021, at the direction of Detective Lucas White from SPD, CS-1 contacted VILLAR-LUGO via the Meta Account "Raldy Lara" to purchase a quantity of fentanyl. The resulting conversation was as follows:

> • CS-1: Hey can I come see you Ill be there around 5 if that's ok.
> • VILLAR-LUGO: Yes what you nees?

- CS-1: I got $750.00
- VILLAR-LUGO: ok.ok.

16.  At approximately 4:30 p.m., Detective White, Special Agent (SA) MacDonald, and TFO

Mansi met with CS-1 at a predetermined meeting location. Due to CS-1 not having a license, CS-

1's significant other agreed to drive CS-1 to the anticipated deal.  CS-1, its significant other, and

the vehicle were searched for contraband with negative results. CS-1 was given $750 in official

advanced funds (OAF) and outfitted with recording/transmitting equipment. CS-1 was then

instructed by Detective White to place a text to the target that read "I am almost there, I have

750." At that point, the SPD detectives followed CS-1 in its vehicle to the McDonald's located at

235 South Broadway, Salem, NH as instructed.

17.  At approximately 4:54 p.m., the conversation via the Meta Account continued:

- VILLAR-LUGO: Salem, NH
- VILLAR-LUGO: my boy
- CS-1-: Yeah
- VILLAR-LUGO: ok, ok
- CS-1: Thank you

At approximately 5:08 p.m., CS-1 texted the target asking how long until he reached the

McDonalds. The Target replied that he was on his way. At approximately 5:35 p.m., CS-1 again

texted the target and asked for its location. The Target said that he was almost there and that

there was traffic. CS-1 then had the following exchange with the Target:

- VILLAR-LUGO:  go to marshall, wall, walk
- CS-1: Oh ok
- VILLAR-LUGO:  lkm, in here now
- CS-1: Ok im walking over, I was at mcdonalds
- VILLAR-LUGO:  im bathroom marhall now, lkm, when you there

- CS-1: Ok bro im almost there
- VILLAR-LUGO:  what schoes you have, shoes
- CS-1: Here now, only 2 stalls, im in the end with boots black.

At that same time, SA MacDonald observed CS-1 exit its car and walk towards the Marshalls store.

18.  At approximately 6:04 p.m., SA MacDonald observed CS-1 enter the front door of the Marshalls. At that time, TFO Mansi observed CS-1 walk inside and enter the bathroom of the Marshalls. At approximately 6:04 p.m., CS-1 texted the target:

- CS-1: Im here now
- VILLAR-LUGO:  go bathroom
- CS-1: ill be there in a minute, im sorry
- VILLAR-LUGO: ok
- CS-1: Im in the bathroom now
- VILLAR-LUGO:  ok

At approximately 6:07 p.m., TFO Mansi observed CS-1 exit the bathroom and walk out of the front door of Marshalls. SA MacDonald and Detective White observed CS-1 walk back towards its car and return to the neutral location for debriefing. Approximately one minute after CS-1 exited the bathroom, TFO Mansi observed a Hispanic male, herein referred to as (HM1) with a black shirt, black hat and a ponytail exit the bathroom and walk to the front area of the store. Approximately one minute later, HM1 exited the Marshalls and walked south toward the Home Depot.  Surveillance units attempted to follow HM1 but he was picked up by a taxi service and surveillance was terminated. At this time in the investigation HM1 has not been identified.

19.  After CS-1 completed the deal, it was followed back to a neutral location where it immediately surrendered the suspected fentanyl. Based upon both Detective White and SA MacDonald's training and experience they recognized this substance relinquished by CS-1 to be

consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. CS-1 and its significant other were searched by law enforcement for contraband with negative results.  CS-1 confirmed that it had purchased the drugs in the bathroom from HM1, who was a Hispanic male with a ponytail and hat.

**Controlled Buy #2:**

20.  On January 25, 2022, Detective White and I contacted CS-1 to set up a controlled purchase of fentanyl from VILLAR-LUGO. At approximately 12:52 p.m., CS-1 contacted VILLAR-LUGO via the Meta Account "Raldy Lara." During the conversation, CS-1 was instructed to introduce an undercover officer via the Meta account to the DTO. A synopsis of the conversation follows:

- CS-1: Hey I'm coming down today bro. It'll be later like 5ish.
- VILLAR-LUGO: Ok good
- VILLAR-LUGO: What you need when you come
- CS-1: Hey I'll be there within an hour. I have 300
- VILLAR-LUGO: Ok
- CS-1: I'll go to Plaza in Methuen. I got one of my boys with my I said I'd hook you up with
- VILLAR-LUGO: Yes
- CS-1: Johnny trappz, he's on my Facebook.
- VILLAR-LUGO: Ok Perfect

As the conversation progressed CS-1 was directed to 170 Haverhill Street, Dollar Tree, Methuen, MA. Prior to the transaction, Detective White and I searched CS-1.  CS-1 was clear of any drugs, money, or contraband. CS-1 was provided with $300.00 in OAF to complete the transaction. Prior to the transaction, members of the MDO and SPD established surveillance in the area.

Acting in an undercover capacity I transported CS-1 to the Dollar Tree. CS-1 was directed to go inside while I waited in the vehicle. Under surveillance, CS-1 went into the Dollar Tree and a short time later returned to the UC vehicle because CS-1 could not locate the dealer. CS-1 again contacted VILLAR-LUGO via the Meta application and was directed to go back into the Dollar Tree. CS-1 entered the Dollar Tree and returned to me a short time later. CS-1 provided me with suspected fentanyl and information about the transaction. Based upon my training and experience I recognized the substance that CS-1 provided to me to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. CS-1 stated CS-1 met with an unknown Hispanic Male, later identified as Angel BAEZ, while in the Dollar Tree. BAEZ provided CS-1 with the suspected fentanyl packaged in a plastic bag. In exchange, CS-1 provided the male with $300.00 in OAF. Members of surveillance were able to follow this male to 97-99 Market Street Lawrence, MA. The identity of BAEZ was determined during a motor vehicle stop detailed later in this affidavit.

**Controlled Buy #3:**

21.  On January 31, 2022, at approximately 1:00 p.m., acting in an undercover capacity, I sent a message to the "RALDY Lara" Meta account via the messenger application to purchase a quantity of fentanyl. A synopsis of the conversation follows:

- • UC: Can I come see you
- • VILLAR-LUGO: Yes
- • VILLAR-LUGO: LKM
- • UC: Aight I will be in Salem in half hour
- • VILLAR-LUGO: What you need
- • UC: $300
- • VILLAR-LUGO: Ok

22.  At approximately 2:15 p.m., I received a video phone call from the same Meta account "RALDY Lara." I answered the call and spoke with a heavy-set Hispanic Male, later identified as VILLAR-LUGO. The conversation lasted approximately 6 seconds and I advised VILLAR-LUGO that I had $300.00. I was unable to capture an image of VILLAR-LUGO during this conversation.

23.  At approximately 2:58 p.m., VILLAR-LUGO contacted me using the Meta application and directed me to Home Depot, 72 Pleasant Valley Street, Methuen, MA. A synopsis of the conversation follows:

- VILLAR-LUGO: 72 Pleasant Valley St Methuen, MA 01844 Estados Unidos
- Me: ok ty I'll be there in 15
- VILLAR-LUGO: Here now Lkm
- ME: Ok almost there
- VILLAR-LUGO: the second toilet enters the bathroom

24.  At approximately 3:21 p.m., I entered the restrooms in Home Depot and met a Hispanic Male, later identified as BAEZ. BAEZ handed me suspected fentanyl and in exchange I gave him $300.00 in OAF.  Based upon my training and experience I recognized this substance to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. BAEZ took the money and left the bathroom. I followed BAEZ out of the Home Depot where he entered a taxicab and left the area.

**Controlled Buy #4**

25.  On February 2, 2022, at approximately 12:03 p.m., acting in an undercover capacity, I again used the Meta Account "Raldy Lara" to negotiate to purchase a quantity of fentanyl. A synopsis of the conversation follows:

- UC: Hey can I come see yo
- VILLAR-LUGO: What you need
- UC: $300
- VILLAR-LUGO: Ok good
- VILLAR-LUGO: 186 Haverhill St Methuen, MA- Home Depot

26.  Prior to my arrival at the address, members of the MDO and SPD established surveillance there. Upon arrival at the location, I noted there was no Home Depot as anticipated. I subsequently video-called on the Meta account for further instructions.  VILLAR-LUGO answered the call. I noted he was the same male with whom I spoke on the video-call prior to the undercover purchase on January 31, 2022. VILLAR-LUGO instructed me to go into the Market Basket at that location and enter the bathroom to meet with his "runner." I affirmed and VILLAR-LUGO ended the call.

27.  A few minutes after the call, I entered the restroom and remained in a toilet stall awaiting further instructions. While in the bathroom I met with BAEZ, the same male with whom I had completed the prior undercover purchase on January 31, 2022.  Due to other individuals in the bathroom, we did not complete the transaction there.  Instead, I followed BAEZ to an aisle in the store where I watched him leave the suspected fentanyl on a store shelf. I then showed BAEZ the money and left it behind other items on the shelf. I collected the suspected fentanyl and BAEZ took the $300.00 in OAF. Based upon my training and experience I recognized this substance to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. I also observed an unidentified Hispanic female with him, herein referred to as HF2. Members of surveillance team followed BAEZ and HF2 back to their residence at 97-99 Market Street, Lawrence, MA after the transaction.

**Agents Identification of VILLAR-LUGO**

28.  During the video call referenced above, I was able to covertly record VILLAR-LUGO

during the call. I showed this photograph to multiple agents.  SA Doud recognized the male from

a prior investigation and advised that he believed this male to be VILLAR-LUGO based upon a

prior investigation he conducted. After speaking with SA Doud and reviewing his report the

following information is a synopsis on his identification of VILLAR-LUGO:

- In June of 2019 SA Doud received information from Officer Scott Powers of the
  Littleton, NH Police Department that a Hispanic male who goes by the name
  "Raldy" is actively selling fentanyl in Lawrence, MA. This male was identified
  as VILLAR-LUGO, which will be explained further. SA Doud was provided
  with a phone number for VILLAR-LUGO, which he began to converse with in
  order to set up an undercover purchase of fentanyl.

- On August 5, 2019 VILLAR-LUGO agreed to meet SA Doud at the Rockingham
  Mall, Salem, NH. SA Doud met with VILLAR-LUGO who provided SA Doud
  with a sample of approximately 15 grams of fentanyl and the two ended their
  contact.

- Surveillance was conducted on VILLAR-LUGO following the transaction and
  TFO Day- Lewis observed VILLAR-LUGO enter in a Honda Accord, MA
  Registration 8XE733. A query of this registration revealed this car was registered
  to Melvin VILLAR-LUGO (DOB 08/19/1998). SA Doud and TFO Day-Lewis
  later reviewed an RMV photograph of VILLAR-LUGO and confirmed he was the
  same male that provided SA Doud with the sample of fentanyl. As noted above
  VILLAR-LUGO was also operating under the name "Raldy" which is the same
  name he is using in this current investigation.

- I also reviewed the photograph of VILLAR-LUGO and noted he was the same male I had covertly recorded on Controlled Buy #4.

**Controlled Buy #5:**

29.  On February 7, 2022, at approximately 1:22 p.m., I sent a message to the Meta Account "Raldy Lara" to buy a quantity of fentanyl. A synopsis of the conversation follows:

- UC: Hey yo can I come see you
- VILLAR-LUGO: Yes
- UC: Only got $250 today
- VILLAR-LUGO: Ok come
- UC: Ok on my way
- VILLAR-LUGO: Go 39 Foster Street Lawrence.

As the conversation progressed, VILLAR-LUGO asked what vehicle I was driving. I described my Ford Escape SUV to VILLAR-LUGO, and he confirmed that his "runner" was on his way. Law enforcement then established surveillance in the area.

30.  At approximately 2:40 p.m., law enforcement observed BAEZ exit his house at 97-99 Market Street and walk to the area of 39 Foster Street. At 2:50 p.m. I parked in front of 39 Foster Street. I advised VILLAR-LUGO I had arrived at the location, and he informed me "30 segundos." A short time later I observed BAEZ, the same male with whom I had done the prior transactions, approach my driver's side window.  I gave him $250.00 in OAF and in exchange he provided me with suspected fentanyl. Based upon my training and experience I recognized this substance to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. BAEZ then walked back in the direction of his house. On March 2, 2022, I received the DEA lab results for the suspected

fentanyl, which indicated the substance purchased was positive for fentanyl. The lab indicated the weight of the fentanyl was 20.132 grams.

**Controlled Buy #6:**

31.  On February 14, 2022, 11:27 a.m., I contacted VILLAR-LUGO on the Meta application to arrange an undercover purchase of fentanyl. The conversation follows:

- UC: Hey Bro. Can I come see you.
- VILLAR-LUGO: Hey When
- UC: I can be down there in like an hour
- VILLAR-LUGO: Perfect Yes
- UC: Still good for the 10 sticks. I got 1,000
- VILLAR-LUGO: Really. Wtf. Why. hahahaha
- UC: I got customers now!
- VILLAR-LUGO: Ok. My brother
- UC: I thought we talked about it last week about it sorry bro
- R: No problem. And ready for you. Ok

As the conversation progressed, I was directed to Home Depot, 72 Pleasant Valley Street, Methuen, MA. Several minutes later I received another message stating, "67 Pleasant Valley St Methuen, MA, Target is better."  Members of the MDO and SPD established surveillance around Target at the address. At approximately 1:32 p.m., I advised VILLAR-LUGO I was at Target. He requested a picture of my shoes and directed me to the bathroom inside the store.

32.  As I was walking into Target, I observed BAEZ also walking into Target with a Hispanic Male, later identified as Leidy Coronado GONZALEZ.  BAEZ was wearing a black winter jacket, backwards baseball cap and ripped jeans. GONZALEZ was wearing jeans and a tan colored sweatshirt and had dyed red hair.  At approximately 1:38 p.m., I entered the restroom

followed a short time later by BAEZ. While inside, I gave BAEZ $1,000.00 in OAF and in exchange BAEZ handed me the suspected fentanyl. Based upon my training and experience I recognized this substance to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. While in the restroom I also observed an unknown white male meet with BAEZ. I observed the white male give BAEZ money in exchange for an unknown substance. BAEZ, the white male, and I exited the bathroom and left the store shortly thereafter.

33.  At approximately 1:48 p.m., SA MacDonald observed BAEZ and GONZALEZ exit Target and walk to their vehicle, a black Honda CRV (MA Registration 2LNG35), which is registered to GONZALEZ. Both BAEZ and GONZALEZ were empty handed when they walked back to the car, indicating they had not made any purchases while inside. SA MacDonald reviewed the Target Security footage and confirmed that neither GONZALEZ nor BAEZ had made any purchases while inside. GONZALEZ also had stayed near the bathroom area in a suspected attempt at counter surveillance.

**<u>Controlled Buy #7:</u>**

34. On February 24, 2022, at approximately 6:21 p.m., I contacted VILLAR-LUGO via the Meta Messenger to purchase fentanyl. The conversation follows:

- UC: Hey bro can I come c u tonight
- VILLAR-LUGO: OK. LKM what you need
- UC: Aight I'm gonna leave Laconia area in a few I'll be there around 8 I'll hit you up when I'm close. $300.00
- VILLAR-LUGO: Perfect OK What time (@ 7:21 PM)
- UC: I'll be in Salem in 15 mins
- VILLAR-LUGO: OK 300$ you have yes?

- UC: Yes
- VILLAR-LUGO: 70 Pleasant Valley St Methuen, MA 01844  Estados Unidos-
  Walmart

35.  Members of the MDO, Massachusetts State Police, and SPD established surveillance around Walmart prior to me responding there. I was equipped with audio and video recording devices for this transaction.  At approximately 8:00 p.m., I arrived at Walmart and received a request from VILLAR-LUGO to send a picture of my shoes. I sent the picture and was directed to go into the bathroom at Walmart.

36.  At approximately 8:12 p.m., Sgt. Tirella observed the black CRV arrive in the parking lot, occupied by several people. Detective White observed the vehicle park on the east side of the Walmart lot. TFO White then observed BAEZ, wearing a red puffy jacket, black jeans and red shoes exit the vehicle and walk to the front of the Walmart.

37.  I entered the bathroom of Walmart and waited several minutes. At approximately 8:15 p.m., I observed BAEZ enter the bathroom. BAEZ gave me the suspected fentanyl over the bathroom stall and in exchange I gave BAEZ $300.00 in OAF. Based upon my training and experience I recognized this substance to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. As BAEZ left the bathroom, I was able to capture him on video.

38. At about the same time, TFO Hamel observed BAEZ exit the bathroom while talking on the phone. BAEZ met GONZALEZ and HF2 inside the store. Both HF2 and GONZALEZ have been present during previous controlled purchases, apparently acting as lookouts for the DTO. At approximately 8:20 p.m., TFO O'Connor observed BAEZ, GONZALEZ and HF2 waiting in line

at the checkout. Approximately one minute later, they walked out the door and back towards their vehicle and eventually departed the area.

**Agents Identify GONZALEZ and BAEZ:**

39.  On March 3, 2022, members of the MDO set up surveillance on the CRV at 70 Union Street, Methuen, MA. At approximately 11:40 a.m., SA MacDonald and I observed GONZALEZ and BAEZ exit the residence and enter the vehicle. They traveled northbound through Methuen, towards New Hampshire. At the request of SA MacDonald, Methuen Police Officer Tardiff conducted a motor vehicle stop on the CRV to identify the occupants. During the stop, the driver identified herself as Leidy Coronado GONZALEZ of 70 Union Street, Apt 5, Methuen, MA. The passenger identified himself as Angel BAEZ of the Dominican Republic.

**Controlled Buy #8**

40.  On March 9, 2022 at approximately 10:10 a.m., I contacted VILLAR-LUGO via the Meta Messenger application to purchase fentanyl. The conversation was as follows:

- UC: Yo
- VILLAR-LUGO: yo
- UC: My messenger is all fucked up but I'm trying to come see you did you get my text on the number
- VILLAR-LUGO: Come an ready. (608) 579-9202. This is my number
- UC: 6179256584 is me ok
- VILLAR-LUGO: OK. Perfct

41.  At approximately 11:28 p.m., I placed a phone call to the number provided by VILLAR-LUGO, 6179256584. During the conversation I spoke with a male whom I believed to be VILLAR-LUGO who asked me what I needed. I advised him I had $250.00 to which he responded "ok." VILLAR-LUGO advised he would send me an address in the next 30 minutes to facilitate the transaction.

42. At approximately 12:22 p.m., I continued my conversation with VILLAR-LUGO via the

Facebook Messenger Application. The conversation was as follows:

- UC: Hey I will be there in 20 mins
- VILLAR-LUGO: 70 Pleasant Valley St Methuen, MA 01844 Estados Unidos. Walmart Methuen
- UC: Ok 20 mins
- VILLAR-LUGO: send picture of your shoes. Go to bathroom

43. At approximately 12:45 p.m., members of the DEA and SPD established surveillance in the

area of Walmart. At approximately 1:05 p.m., I entered Walmart and responded to the bathroom

as instructed by VILLAR-LUGO. A short time later I observed Baez enter the bathroom stall

next to me. Once in the stall Baez provided me with the suspected fentanyl and in exchange I

provided him with $250.00 in OAF. I subsequently left Walmart and ended my contact with

Baez.

**Meta Warrant Completion**

44. On March 16, 2022 I completed a search warrant and supporting affidavit for the

https://www.facebook.com/raldy.lara Meta account. The search warrant was subsequently

granted by the Honorable Judge Andrea K. Johnstone and uploaded to Meta.

**Controlled Buy #9**

45. On March 24, 2022 at approximately 1:24 p.m., I contacted VILLAR-LUGO via the phone

number (608) 579-9202 to purchase fentanyl. The conversation was as follows:

- UC: Yooo can I cone see you
- VILLAR-LUGO: Uou. Yes and ready have fire (based upon my training and experience I know "Fire" to be a term for potent fentanyl).
- UC: My man. You do like 25g for 300?
- VILLAR-LUGO: ok come
- UC: wont be there until like 3-330 in Laconia ill let u know
- VILLAR-LUGO: Perfct ok

46.  At approximately 2:28 p.m., I advised VILLAR-LUGO I was in the area of

Methuen/Lawrence, MA. VILLAR-LUGO directed me to respond to Burger King, 95 Pleasant

Valley Street, Methuen, MA and instructed me to go to the bathroom.

47.  Members of the DEA subsequently established surveillance in the area of Burger King. At

approximately 2:51 p.m., I arrived at Burger King and responded to the bathroom. Once inside I

made contact with a male whom I immediately recognized to be Albert VENTURA. VENTURA

is known to me through prior contacts and was arrested by the DEA several months prior.

VENTURA provided me with the suspected fentanyl and in return I provided him with the

$300.00 in OAF. I then left the bathroom and ended my contact with VENTURA. VENTURA

was later seen entering into the Honda CRV registered to him.

**April 8, 2022 First Meta Warrant Review**

48.  On April 8, 2022 I received the requested information on the search warrant from Meta. SA

MacDonald and I reviewed the account information and it was evident the account was being

used to distribute narcotics. With assistance from DEA analysts we were able to identify over

100 customers of this DTO that are using the Meta Messenger Application to complete narcotics

transactions. A thorough review of individual conversations between customers and the DTO

was completed. The results of this review is there have been over 8 kilograms of fentanyl

distributed to multiple customers from this DTO. In addition to the fentanyl there were also two

firearms sold to the DTO utilizing the Meta Messenger Application. The narcotics transactions

were consistent from October to March 16 (expiration of the search warrant information)

indicating the account is still actively being used by this DTO.

49.  After further review of the information provided by Meta the Visa Card 411770-XX-

XXXX-5311 was shown to be associated with this account. Based upon my training

and experience I know DTO's frequently send and receive money through various

online platforms. Any transaction history associated with the Facebook Account would provide further information into the inner-workings of this DTO and further assist with identifying other involved individuals.

**Arrest of additional Confidential Source (CS-2)**

50. On May 23, 2022 the Nashua Police Department arrested a Confidential Source, herein referred to as CS-2. I debriefed CS-2 and CS-2 provided information into the RALDY DTO which was consistent with what investigators had learned thus far in this case. CS-2 advised CS-2 could purchase fentanyl from the DTO and has been doing so for several years.

**June 3, 2022 2nd Meta Warrant Review**

51. On June 3, 2022 I reviewed the information provided by Meta for the information on raldy.lara account from March 16 - May 16. After reviewing the information it was evident the DTO is continuing to use this Meta Account as a means of selling fentanyl. The DTO sold multiple additional kilograms of fentanyl to various customers throughout NH and MA.

**Controlled Buy 10**

52. On July 5, 2022 TFO O'Connor and I made contact with CS-2 to set up a controlled purchase of fentanyl. At approximately 12:00 p.m., CS-2 contacted VILLAR-LUGO via the Meta messenger application on the "Raldy.lara" account. The conversation was as follows:

- CS-2: Yooo
- CS-2: I need 45
- VILLAR-LUGO: 45 g?
- CS-2: Yes
- VILLAR-LUGO: OK
- CS-2: Where do I go
- VILLAR-LUGO: Lawrence. Lkm when close. Go loop
- VILLAR-LUGO: You have cash app
- CS-2: No
- VILLAR-LUGO: ok

53. At approximately 12:15 p.m., CS-2 received a phone call via Meta from VILLAR-LUGO.

VILLAR-LUGO directed CS-2 to travel to 120 Willow Street, Lawrence, MA to complete the

transaction. Members of the MDO and MSP subsequently established surveillance in the area

of the anticipated transaction.

54. Prior to the deal CS-2 and CS-2's vehicle were searched by TFO O'Connor and I. Both were

clear of any contraband. CS-2 was provided with $600.00 in OAF and also provided with both

audio and video transmitting equipment.

55. At approximately 12:55 p.m., CS-2 arrived at 120 Willow Street and parked on the side of the

street. A short time later surveillance observed a Hispanic male later identified as, Elaine

VILLAR-SOTO, approach the passenger's side of CS-2's vehicle. VILLAR-SOTO reached

into the passenger's side window and a short time later he walked away from the vehicle. CS-2

then contacted me and advised CS-2 had just completed the transaction with a Hispanic male

who came to his passenger's side window.

56. CS-2 then left the area and travelled directly to the pre-determined meeting location. Upon

making contact with CS-2 he relinquished the suspected fentanyl to me. CS-2 stated CS-2

travelled to 120 Willow Street and parked on the side of street. CS-2 was then approached by

VILLAR-SOTO on the passenger's side of CS-2's vehicle. CS-2 provided VILLAR-SOTO

with the $600.00 in OAF and in exchange VILLAR-SOTO provided CS-2 with the suspected

fentanyl. After the transaction members of surveillance observed VILLAR-SOTO enter into an

apartment in the area of 109 Spruce Street.

57. I later reviewed the audio and video recordings from the transaction and was able to capture a

still image of VILLAR-SOTO. CS-2's account of the incident was consistent with my review

of the audio and video recordings of the transaction.

**Agents Identify Elaine VILLAR-SOTO**

58. On July 11, 2022 members of the DEA assisted the MSP in executing an arrest and search

warrant at 109 Spruce Street in Lawrence, MA for an unrelated investigation. During the execution of the search warrant VILLAR-SOTO was located within a bedroom and appeared to be living within the apartment. VILLAR-SOTO was identified via several documents and taken into custody by MSP.

**Controlled Buy 11**

59. On July 12, 2022 TFO O'Connor and I made contact with CS-2 to set up a controlled purchase of fentanyl. At approximately 11:37 a.m., CS-2 contacted VILLAR-LUGO via the Meta messenger application on the "Raldy.lara" account. The conversation was as follows:

- CS-2: Yoo
- CS-2: I'm like 20 mins away ima need 70. Where should I be
- VILLAR-LUGO: Go Loop
- VILLAR-LUGO: How much money you have for those 70
- CS-2: 800
- VILLAR-LUGO: ok

60. Prior to the deal CS-2 and CS-2's vehicle were searched by TFO O'Connor and I, and were clear of any contraband. CS-2 was provided with $800.00 in OAF and also provided with both audio and video transmitting equipment.

61. At approximately 1:20 p.m., the conversation continued via the Meta messenger application and CS-2 was directed to Wendy's, 95 Pleasant Valley Street, Methuen, MA. Members of the MDO subsequently established surveillance in the area of Wendy's. CS-2 travelled to Wendy's where constant surveillance was maintained on CS-2. The conversation between CS-2 and VILLAR-LUGO continued as follows:

- CS-2: Pullin up. Here. Go in?
- VILLAR-LUGO: Yes go to store
- CS-2: ok. Here way
- VILLAR-LUGO: Send picture. Nada Hat shoes you in.
- CS-2: (Sent photograph)

62. At approximately 1:30 p.m., CS-2 entered Wendy's. At approximately 1:35 p.m., a Hispanic

male, later identified as, Felix Manuel MEJIA-GONZALEZ, entered Wendy's. A short time

later CS-2 exited Wendy's, returned to CS-2's vehicle and left the area. I was contacted by CS-

2 who advised CS-2 completed the transaction in the restroom of Wendy's. CS-2 provided a

description of the male which matched that of MEJIA-GONZALEZ.

63. CS-2 then travelled to the pre-determined meet location where CS-2 met with TFO O'Connor

and I. Upon making contact, CS-2 relinquished the suspected fentanyl to me. CS-2 and CS-2's

vehicle were searched for contraband with negative results. CS-2 was debriefed on the

transaction and stated CS-2 entered the Wendy's restroom upon request of VILLAR-LUGO.

CS-2 stated once inside CS-2 met with MEJIA-GONZALEZ near the urinal. CS-2 provided

MEJIA-GONZALEZ with the $800.00 in OAF and in exchange MEJIA-GONZLAEZ provided

CS-2 with the suspected fentanyl.

64. I later reviewed the audio and video recordings of the transaction which were consistent with

CS-2's account of the incident.

**<u>Controlled Buy 12</u>**

65. On July 26, 2022 TFO O'Connor and I made contact with CS-2 to set up a controlled purchase

of fentanyl. At approximately 11:50 a.m., CS-2 contacted VILLAR-LUGO via the Meta

messenger application on the "Raldy.lara" account. The conversation was as follows:

- CS-2: Yoooo. I got 800.
- VILLAR-LUGO: Ok
- CS-2: I'm in Salem
- VILLAR-LUGO: Ok
- VILLAR-LUGO: Go Loop. Wendys
- CS: Tato
- VILLAR-LUGO: What time
- VILLAR-LUGO: Ok

66. Prior to the deal CS-2 and CS-2's vehicle were searched by TFO O'Connor and I, and were

clear of any contraband. CS-2 was provided with $800.00 in OAF and also provided with both audio and video transmitting equipment.

67. At approximately 12:00 p.m., CS-2 travelled to Wendy's were constant surveillance was maintained on CS-2. CS-2 continued the conversation with VILLAR-LUGO as follows:

- CS-2: Here
- VILLAR-LUGO: ok. Wendys?
- CS-2: Yes papa
- VILLAR-LUGO: How much money
- CS:2: 800
- VILLAR-LUGO: Ok
- CS-2: WAY
- VILLAR-LUGO: Go Burger King Is Better
- CS-2: ok
- VILLAR-LUGO: Here now
- CS-2: Here.
- VILLAR-LUGO: Go bathroom.

68. During this conversation members of the MDO set up surveillance in the area of Burger King, which is located across the street from Wendy's. At approximately 12:26 p.m., CS-2 entered Burger King. A short time later CS-2 exited Burger King and returned to CS-2's vehicle. CS-2 contacted me and advised CS-2 had left his/her cellular phone in the vehicle and was returning to finish the transaction. CS-2 retrieved the phone and went back into Burger King.

69. At approximately 12:30 p.m., CS-2 exited Burger King and returned to CS-2's vehicle. CS-2 contacted me and advised CS-2 had completed the transaction in the Burger King bathroom with the same person as the last deal, MEJIA-GONZALEZ. This information was subsequently relayed to the surveillance members of the MDO.

70. CS-2 then travelled to the pre-determined meet location where TFO O'Connor and I met with CS-2. Upon making contact, CS-2 relinquished the suspected fentanyl to me. CS-2 and CS-2's vehicle were searched for contraband with negative results. CS-2 was debriefed on the

transaction and stated CS-2 entered the Burger King restroom upon request of VILLAR-LUGO. CS-2 stated once inside CS-2 met with MEJIA-GONZALEZ near the urinal. CS-2 provided MEJIA-GONZALEZ with the $800.00 in OAF and in exchange MEJIA-GONZLAEZ provided CS-2 with the suspected fentanyl.

71. I later reviewed the audio and video recordings of the transaction which corroborated CS-2's account of the incident. Furthermore, I was able to capture a still image of MEJIA-GONZALEZ.

**Agents Identify Felix MEJIA-GONZALEZ**

72. On July 27, 2022 investigators compared surveillance photographs from the controlled purchases with photographs from internal DEA databases. Through research it was determined the surveillance photographs matched a picture of MEJIA-GONZALEZ.

**DTOs Use of Meta (Facebook) Accounts:**

73.  I know in my investigative experience that drug traffickers often "friend" other co-conspirators and take photographs and post them to their Meta accounts. I also believe that this search warrant will allow agents to identify other co-conspirators not yet known to this investigation. I also know that drug traffickers will often attempt to contact drug customers through Meta. In my experience, traffickers believe they will be safer if they investigate a potential customer's social media presence prior to meeting face to face. Traffickers believe that if they see a stronger social media presence, the less likely the customer could be an undercover officer.

74.  A preservation request was served on Meta for the account associated with https://www.facebook.com/raldy.lara on October 13, 2021. Meta has indicated that it has taken reasonable steps to preserve this account.

75.  Meta Platforms Inc owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Meta allows its users to establish accounts with Meta, and users can then use their accounts to share written news, photographs, videos, and other information with other Meta users, and sometimes with the general public.

76.  Meta asks users to provide basic contact and personal identifying information to Meta, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Meta passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Meta also assigns a user identification number to each account.

77.  Meta users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Meta assigns a group identification number to each group. A Meta user can also connect directly with individual Meta users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Meta and can exchange communications or view information about each other. Each Meta user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

78.  Meta users can select different levels of privacy for the communications and information associated with their Meta accounts. By adjusting these privacy settings, a Meta user can make information available only to himself or herself, to particular Meta users, or to anyone with access to the Internet, including people who are not Meta users. A Meta user can also create "lists" of Meta friends to facilitate the application of these privacy settings. Meta accounts also

include other account settings that users can adjust to control, for example, the types of notifications they receive from Meta.

79.  Meta users can create profiles that include photographs, lists of personal interests, and other information. Meta users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Meta users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Meta users can "check in" to particular locations or add their geographic locations to their Meta posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

80.  Meta allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Meta users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Meta's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

81.  Meta users can exchange private messages on Meta with other users. Those messages are stored by Meta unless deleted by the user. Meta users can also post comments on the Meta profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Meta has a chat feature that allows users to send and receive instant messages through Meta Messenger. These chat communications are

stored in the chat history for the account. Meta also has Video and Voice Calling features, and although Meta does not record the calls themselves, it does keep records of the date of each call.

82. If a Meta user does not want to interact with another user on Meta, the first user can "block" the second user from seeing his or her account.

83. Meta has a "like" feature that allows users to give positive feedback or connect to particular pages. Meta users can "like" Meta posts or updates, as well as webpages or content on third-party (i.e., non-Meta) websites.

84. Meta has a search function that enables its users to search Meta for keywords, usernames, or pages, among other things.

85. Each Meta account has an activity log, which is a list of the user's posts and other Meta activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Meta page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Meta page.

86. Meta also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

87. In addition to the applications described above, Meta also provides its users with access to thousands of other applications ("apps") on the Meta platform. When a Meta user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

88.  Meta also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Meta, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Meta profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

89.  Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Meta users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

90.  As explained herein, information stored in connection with a Meta account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Meta user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Meta account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and

tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Meta account at a relevant time. Further, Meta account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.

91. Such information allows investigators to understand the geographic and chronological context of Meta access, use, and events relating to the crime under investigation. Additionally, Meta builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Meta "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Meta account owner. Last, Meta account activity may provide relevant insight into the Meta account owner's state of mind as it relates to the offense under investigation. For example, information on the Meta account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

92. Therefore, the computers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Meta, such as account access information, transaction information, and other account information.

/s/ John Hannigan
John Hannigan, Task Force Officer
Drug Enforcement Administration


The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim.

P. 4.1 and affirmed under oath the content of this affidavit and application.

Date:   **Aug 18, 2022**

United States Magistrate Judge

Time:   **2:05 PM, Aug 18, 2022**

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with the Meta (Facebook) account associated with the account www.facebook.com/raldy.lara that is stored at premises owned, maintained, controlled, or operated by Meta Inc., a company headquartered in Menlo Park, California.

# Attachment B

## Particular Things to be Seized

**Information to be disclosed by Meta**

For the time period from May 16, 2022 to the present, to the extent that the information described in Attachment A is within the possession, custody, or control of Meta Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)    All contact and personal identifying information, full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Meta activities;

(c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Meta user identification numbers; groups and networks of which the user is a member, including the groups' Meta group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Meta applications;

(e)    All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)    All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)    All "check ins" and other location information;

(h)    All IP logs, including all records of the IP addresses that logged in to the account;

(i)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)      All information about the Meta pages that the account is or was a "fan" of;

(k)      All past and present lists of friends created by the account;

(l)      All records of Meta searches performed by the account;

(m)      All information about the user's access and use of Meta

         Marketplace;

(n)      The types of service utilized by the user;

(o)      The length of service (including start date) and the means and source of any

         payments associated with the service (including any credit card or bank

         account number); including any and all transactions associated with the

         Visa Card 411770-XX-XXXX-5311.

(p)      All privacy settings and other account settings, including privacy settings

         for individual Meta posts and activities, and all records showing which

         Meta users have been blocked by the account;

(q)      All records pertaining to communications between Meta and any

         person regarding the user or the user's Meta account, including

         contacts with support services and records of actions taken.

         Meta is hereby ordered to disclose the above information to

the government within **14 days** of issuance of this warrant.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. § 841 (distribution of controlled substances and possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances), and 21 U.S.C. § 843(b) (unlawful use of a communication facility) involving Melvin VILLAR-LUGO since May 16, 2022, including, for each user identified on Attachment A, information pertaining to the following matters:

(a) The unlawful acquisition, possession or distribution of controlled substances and the unlawful use of a communication facility;

(b) Evidence indicating how and when the Meta account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Meta account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(e) The identity of person(s) who communicated with the user about matters relating to the acquisition, possession, or distribution of controlled substances.

# EXHIBIT 4

# (23-mj-12-01-AJ)

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


| IN THE MATTER OF THE SEARCH OF | ) | No.  23-mj-12-01-AJ |
| INFORMATION PERTAINING TO THE | ) | |
| META (FACEBOOK) ACCOUNT | ) | |
| WWW.FACEBOOK.COM/RALDY.LARA | ) | **FILED UNDER SEAL** |


**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Task Force Officer John Hannigan being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of an application for a search warrant for information associated with a certain Meta account that is stored at premises owned, maintained, controlled, or operated by Meta Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with Meta.com/raldy.lara.

2.  I am a police officer employed by the Nashua Police Department (NPD since 2010. In September 2019, I transferred to NPD's Narcotics Intelligence Division, where I conducted investigations into narcotics-related offenses. Since August 2021, I have served as a Task Force Officer (TFO) to the Drug Enforcement Administration (DEA) Strike Force, Manchester, New

Hampshire District Office. I have attended narcotics and criminal investigation training classes administered by the New Hampshire Police Standards and Training Council, the DEA, the Northeast Counterdrug Training Center, as well as by the NPD.

3.  As a DEA TFO, I am authorized to investigate violations of the laws of the United States, including violations of the federal drug laws and money laundering laws in Title 21 and Title 18, respectively, of the United States Code. " I am a Federal Law Enforcement Officer within the meaning of Federal Rule of Criminal Proceeding 41 (a)(2)(C), that is , a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a Search Warrant.

4.  Through my training, education, and experience, I have become generally familiar with the way drug trafficking organizations ("DTOs") conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. I have participated in the execution of numerous search warrants resulting in the seizure of large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances; United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants and executing arrests.

5.   Based on my training and experience, I am familiar with the methods of operation employed by narcotics traffickers. I am aware that some narcotics traffickers utilize other means of electronic communication – including the Meta Platforms Inc messenger application in support of their trafficking. I am also aware that narcotics traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

      a.     my experience investigating drug-trafficking offense

      b.     oral and written reports and documents about this investigation that I have received from members of the DEA, local law enforcement, and other federal law enforcement agencies;

      c.     discussions I have had personally concerning this investigation with experienced narcotics investigators;

      d.     physical and fixed camera surveillance conducted by the DEA and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

      e.     public records and law enforcement databases;

      f.     telephone toll records, pen register and trap and trace information, and telephone subscriber information; and

      g.     geolocation information.

6.   Unless otherwise indicated, the statements contained herein are summaries of information that I have received from other law enforcement officers, and I specifically relied on oral reports from other law enforcement officers. When information is based on my personal knowledge or conclusion, it will be so stated.

7.   Since this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of a search warrant, I have not included details about every aspect of the investigation. While this affidavit contains all the material information I am aware

of that is pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

8.  Based on the facts set forth in this affidavit, I submit that there is probable cause to believe, and I do believe, that Melvin VILLAR-LUGO and others known and unknown have committed, are committing, and will continue to commit violations of 21 U.S.C. § 841 (distribution of controlled substances and possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances), and 21 U.S.C. § 843(b) (unlawful use of a communication facility). There is also probable cause to search the information described in Attachment A for evidence of these crimes as described in Attachment B.

## CONFIDENTIAL SOURCE INFORMAITON (CS-1)

9.  Agents of the DEA and local officers have received information concerning the illegal drug trafficking activities of the Raldy Drug Trafficking Organization (Raldy DTO) from a confidential source. Pertinent to this investigation, agents have been receiving information from Confidential Source 1 (CS-1) regarding the drug trafficking activities of this DTO.

10.  CS-1 began providing information to agents on or about October 6, 2021.  CS-1's cooperation was in exchange for potential consideration in a pending New Hampshire state charge for possession of a controlled drug with intent to distribute.  In return for CS-1's cooperation in this case, agents have made no promises, nor did agents offer compensation or any other consideration. CS-1 has an extensive criminal history, including convictions for possession of a class A and B drugs, distribution of a class A and B drugs, Conspiracy to violate the controlled substance act and possession of a controlled substance within a school zone.

11. According to CS-1, CS-1 had a pre-existing drug-trafficking relationship with a Dominican drug trafficking organization led by an individual known as "Raldy".  CS-1 stated that it had been purchasing fentanyl from Raldy and his co-conspirators for approximately two years.  CS-1 stated that initially contacted Raldy through telephone number 978-881-8989 and also the Meta account (Formerly Facebook) of "Raldy.Lara." CS-1 told agents that arranged fentanyl purchases with Raldy and then traveled to a location designated by Raldy. CS-1 then met a "runner" (an individual tasked with delivering the drugs) in a public area to complete the exchange. CS-1 stated that a typical drug transaction occurred in the bathroom of a business or through the window of his car on a residential street in Lawrence or Methuen. CS-1 stated that it had done drug transactions with between 8-10 different "runners" over the course of its business with Raldy and his organization. CS-1 also stated that in the past approximately six months, it had primarily been in communication with Raldy via the Meta account https://www.facebook.com/raldy.lara. CS-1 stated that it did not believe the 978-881-8989 telephone was still being used.

12.  CS-1 conducted a controlled purchase of fentanyl from the Raldy DTO in October and January of 2021. These purchases will be detailed further in this affidavit. Additionally, in January of 2022, CS-1 successfully introduced an undercover agent into the Raldy DTO. Since the introduction of the undercover agent, the use of CS-1 has no longer been necessary.

13.  All information from CS-1 that could be corroborated by agents has proven true and accurate. For example, agents confirmed historical information provided by CS-1 through open source searches, social media searches, review of photographs, and review of police records.  In addition, toll records and photographs of call logs and text messages were used to verify contacts between CS-1 and the https://www.facebook.com/raldy.lara Meta account. This account has been identified by Meta as Target number 100041467633575. To my knowledge,

CS-1 has never provided misleading or incorrect information to any law enforcement officer. For these reasons, I consider CS-1's information related to this investigation to be credible and reliable.

## PROBABLE CAUSE

14.   In October 2021 members of the Salem, New Hampshire Police Department (SPD) generated a confidential source, referred to as CS-1, who provided information into a Drug Trafficking Organization (DTO) based in Lawrence, Massachusetts. The CS advised this organization is utilizing the Meta (formerly Facebook) Account "Raldy Lara" to complete their narcotics transactions. I reviewed this account identified as https://facebook.com/raldy.lara. This account does not contain any personal information and appears to be created as a means of communication via the Meta Messenger application. During the investigation the subject operating the "Raldy Lara" Meta Account contacted me while I was operating in an undercover capacity. During this conversation I was able to capture an image of the male's face. This male is believed to be Melvin VILLAR-LUGO. The name "Raldy" is believed to be an alias of VILLAR-LUGO. Further explanation into this identification will be explained later in the affidavit to keep the series of events in chronological order.

### Controlled Buy #1:

15.   On October 6, 2021, at the direction of Detective Lucas White from SPD, CS-1 contacted VILLAR-LUGO via the Meta Account "Raldy Lara" to purchase a quantity of fentanyl. The resulting conversation was as follows:

- CS-1: Hey can I come see you Ill be there around 5 if that's ok.
- VILLAR-LUGO: Yes what you nees?

- CS-1: I got $750.00
- VILLAR-LUGO: ok.ok.

16.  At approximately 4:30 p.m., Detective White, Special Agent (SA) MacDonald, and TFO Mansi met with CS-1 at a predetermined meeting location. Due to CS-1 not having a license, CS-1's significant other agreed to drive CS-1 to the anticipated deal.  CS-1, its significant other, and the vehicle were searched for contraband with negative results. CS-1 was given $750 in official advanced funds (OAF) and outfitted with recording/transmitting equipment. CS-1 was then instructed by Detective White to place a text to the target that read "I am almost there, I have 750."  At that point, the SPD detectives followed CS-1 in its vehicle to the McDonald's located at 235 South Broadway, Salem, NH as instructed.

17.  At approximately 4:54 p.m., the conversation via the Meta Account continued:

- VILLAR-LUGO: Salem, NH
- VILLAR-LUGO: my boy
- CS-1-: Yeah
- VILLAR-LUGO: ok, ok
- CS-1: Thank you

At approximately 5:08 p.m., CS-1 texted the target asking how long until he reached the McDonalds. The Target replied that he was on his way. At approximately 5:35 p.m., CS-1 again texted the target and asked for its location. The Target said that he was almost there and that there was traffic. CS-1 then had the following exchange with the Target:

- VILLAR-LUGO:  go to marshall, wall, walk
- CS-1: Oh ok
- VILLAR-LUGO:  lkm, in here now
- CS-1: Ok im walking over, I was at mcdonalds
- VILLAR-LUGO:  im bathroom marhall now, lkm, when you there

- • CS-1: Ok bro im almost there
- • VILLAR-LUGO:  what schoes you have, shoes
- • CS-1: Here now, only 2 stalls, im in the end with boots black.

At that same time, SA MacDonald observed CS-1 exit its car and walk towards the Marshalls store.

18.  At approximately 6:04 p.m., SA MacDonald observed CS-1 enter the front door of the Marshalls. At that time, TFO Mansi observed CS-1 walk inside and enter the bathroom of the Marshalls. At approximately 6:04 p.m., CS-1 texted the target:

- • CS-1: Im here now
- • VILLAR-LUGO:  go bathroom
- • CS-1: ill be there in a minute, im sorry
- • VILLAR-LUGO:  ok
- • CS-1: Im in the bathroom now
- • VILLAR-LUGO:  ok

At approximately 6:07 p.m., TFO Mansi observed CS-1 exit the bathroom and walk out of the front door of Marshalls. SA MacDonald and Detective White observed CS-1 walk back towards its car and return to the neutral location for debriefing. Approximately one minute after CS-1 exited the bathroom, TFO Mansi observed a Hispanic male, herein referred to as (HM1) with a black shirt, black hat and a ponytail exit the bathroom and walk to the front area of the store. Approximately one minute later, HM1 exited the Marshalls and walked south toward the Home Depot.  Surveillance units attempted to follow HM1 but he was picked up by a taxi service and surveillance was terminated. At this time in the investigation HM1 has not been identified.

19.  After CS-1 completed the deal, it was followed back to a neutral location where it immediately surrendered the suspected fentanyl. Based upon both Detective White and SA MacDonald's training and experience they recognized this substance relinquished by CS-1 to be

consistent with fentanyl. Due to current DEA protocols and the potential danger of testing

fentanyl a field test was not completed on the substance. CS-1 and its significant other were

searched by law enforcement for contraband with negative results.  CS-1 confirmed that it had

purchased the drugs in the bathroom from HM1, who was a Hispanic male with a ponytail and

hat.

**Controlled Buy #2:**

20.  On January 25, 2022, Detective White and I contacted CS-1 to set up a controlled purchase

of fentanyl from VILLAR-LUGO. At approximately 12:52 p.m., CS-1 contacted VILLAR-

LUGO via the Meta Account "Raldy Lara." During the conversation, CS-1 was instructed to

introduce an undercover officer via the Meta account to the DTO. A synopsis of the conversation

follows:

- CS-1: Hey I'm coming down today bro. It'll be later like 5ish.
- VILLAR-LUGO: Ok good
- VILLAR-LUGO: What you need when you come
- CS-1: Hey I'll be there within an hour. I have 300
- VILLAR-LUGO: Ok
- CS-1: I'll go to Plaza in Methuen. I got one of my boys with my I said I'd hook you up with
- VILLAR-LUGO: Yes
- CS-1: Johnny trappz, he's on my Facebook.
- VILLAR-LUGO: Ok Perfect

As the conversation progressed CS-1 was directed to 170 Haverhill Street, Dollar Tree, Methuen,

MA. Prior to the transaction, Detective White and I searched CS-1.  CS-1 was clear of any drugs,

money, or contraband. CS-1 was provided with $300.00 in OAF to complete the transaction.

Prior to the transaction, members of the MDO and SPD established surveillance in the area.

Acting in an undercover capacity I transported CS-1 to the Dollar Tree. CS-1 was directed to go inside while I waited in the vehicle. Under surveillance, CS-1 went into the Dollar Tree and a short time later returned to the UC vehicle because CS-1 could not locate the dealer. CS-1 again contacted VILLAR-LUGO via the Meta application and was directed to go back into the Dollar Tree. CS-1 entered the Dollar Tree and returned to me a short time later. CS-1 provided me with suspected fentanyl and information about the transaction. Based upon my training and experience I recognized the substance that CS-1 provided to me to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. CS-1 stated CS-1 met with an unknown Hispanic Male, later identified as Angel BAEZ, while in the Dollar Tree. BAEZ provided CS-1 with the suspected fentanyl packaged in a plastic bag. In exchange, CS-1 provided the male with $300.00 in OAF. Members of surveillance were able to follow this male to 97-99 Market Street Lawrence, MA. The identity of BAEZ was determined during a motor vehicle stop detailed later in this affidavit.

**Controlled Buy #3:**

21.  On January 31, 2022, at approximately 1:00 p.m., acting in an undercover capacity, I sent a message to the "RALDY Lara" Meta account via the messenger application to purchase a quantity of fentanyl. A synopsis of the conversation follows:

- UC: Can I come see you
- VILLAR-LUGO: Yes
- VILLAR-LUGO: LKM
- UC: Aight I will be in Salem in half hour
- VILLAR-LUGO: What you need
- UC: $300
- VILLAR-LUGO: Ok

22.  At approximately 2:15 p.m., I received a video phone call from the same Meta account "RALDY Lara." I answered the call and spoke with a heavy-set Hispanic Male, later identified as VILLAR-LUGO. The conversation lasted approximately 6 seconds and I advised VILLAR-LUGO that I had $300.00. I was unable to capture an image of VILLAR-LUGO during this conversation.

23.  At approximately 2:58 p.m., VILLAR-LUGO contacted me using the Meta application and directed me to Home Depot, 72 Pleasant Valley Street, Methuen, MA. A synopsis of the conversation follows:

- VILLAR-LUGO: 72 Pleasant Valley St Methuen, MA 01844 Estados Unidos
- Me: ok ty I'll be there in 15
- VILLAR-LUGO: Here now Lkm
- ME: Ok almost there
- VILLAR-LUGO: the second toilet enters the bathroom

24.  At approximately 3:21 p.m., I entered the restrooms in Home Depot and met a Hispanic Male, later identified as BAEZ. BAEZ handed me suspected fentanyl and in exchange I gave him $300.00 in OAF.  Based upon my training and experience I recognized this substance to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. BAEZ took the money and left the bathroom. I followed BAEZ out of the Home Depot where he entered a taxicab and left the area.

**Controlled Buy #4**

25.  On February 2, 2022, at approximately 12:03 p.m., acting in an undercover capacity, I again used the Meta Account "Raldy Lara" to negotiate to purchase a quantity of fentanyl. A synopsis of the conversation follows:

- UC: Hey can I come see yo
- VILLAR-LUGO: What you need
- UC: $300
- VILLAR-LUGO: Ok good
- VILLAR-LUGO: 186 Haverhill St Methuen, MA- Home Depot

26.  Prior to my arrival at the address, members of the MDO and SPD established surveillance there. Upon arrival at the location, I noted there was no Home Depot as anticipated. I subsequently video-called on the Meta account for further instructions.  VILLAR-LUGO answered the call. I noted he was the same male with whom I spoke on the video-call prior to the undercover purchase on January 31, 2022. VILLAR-LUGO instructed me to go into the Market Basket at that location and enter the bathroom to meet with his "runner." I affirmed and VILLAR-LUGO ended the call.

27.  A few minutes after the call, I entered the restroom and remained in a toilet stall awaiting further instructions. While in the bathroom I met with BAEZ, the same male with whom I had completed the prior undercover purchase on January 31, 2022.  Due to other individuals in the bathroom, we did not complete the transaction there.  Instead, I followed BAEZ to an aisle in the store where I watched him leave the suspected fentanyl on a store shelf. I then showed BAEZ the money and left it behind other items on the shelf. I collected the suspected fentanyl and BAEZ took the $300.00 in OAF. Based upon my training and experience I recognized this substance to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. I also observed an unidentified Hispanic female with him, herein referred to as HF2. Members of surveillance team followed BAEZ and HF2 back to their residence at 97-99 Market Street, Lawrence, MA after the transaction.

**Agents Identification of VILLAR-LUGO**

28.  During the video call referenced above, I was able to covertly record VILLAR-LUGO

during the call. I showed this photograph to multiple agents.  SA Doud recognized the male from

a prior investigation and advised that he believed this male to be VILLAR-LUGO based upon a

prior investigation he conducted. After speaking with SA Doud and reviewing his report the

following information is a synopsis on his identification of VILLAR-LUGO:

- In June of 2019 SA Doud received information from Officer Scott Powers of the

  Littleton, NH Police Department that a Hispanic male who goes by the name

  "Raldy" is actively selling fentanyl in Lawrence, MA. This male was identified

  as VILLAR-LUGO, which will be explained further. SA Doud was provided

  with a phone number for VILLAR-LUGO, which he began to converse with in

  order to set up an undercover purchase of fentanyl.

- On August 5, 2019 VILLAR-LUGO agreed to meet SA Doud at the Rockingham

  Mall, Salem, NH. SA Doud met with VILLAR-LUGO who provided SA Doud

  with a sample of approximately 15 grams of fentanyl and the two ended their

  contact.

- Surveillance was conducted on VILLAR-LUGO following the transaction and

  TFO Day- Lewis observed VILLAR-LUGO enter in a Honda Accord, MA

  Registration 8XE733. A query of this registration revealed this car was registered

  to Melvin VILLAR-LUGO (DOB 08/19/1998). SA Doud and TFO Day-Lewis

  later reviewed an RMV photograph of VILLAR-LUGO and confirmed he was the

  same male that provided SA Doud with the sample of fentanyl. As noted above

  VILLAR-LUGO was also operating under the name "Raldy" which is the same

  name he is using in this current investigation.

- I also reviewed the photograph of VILLAR-LUGO and noted he was the same
  male I had covertly recorded on Controlled Buy #4.

**Controlled Buy #5:**

29.  On February 7, 2022, at approximately 1:22 p.m., I sent a message to the Meta Account
"Raldy Lara" to buy a quantity of fentanyl. A synopsis of the conversation follows:

- UC: Hey yo can I come see you
- VILLAR-LUGO: Yes
- UC: Only got $250 today
- VILLAR-LUGO: Ok come
- UC: Ok on my way
- VILLAR-LUGO: Go 39 Foster Street Lawrence.

As the conversation progressed, VILLAR-LUGO asked what vehicle I was driving. I described
my Ford Escape SUV to VILLAR-LUGO, and he confirmed that his "runner" was on his way.
Law enforcement then established surveillance in the area.

30.  At approximately 2:40 p.m., law enforcement observed BAEZ exit his house at 97-99
Market Street and walk to the area of 39 Foster Street. At 2:50 p.m. I parked in front of 39 Foster
Street. I advised VILLAR-LUGO I had arrived at the location, and he informed me "30
segunds." A short time later I observed BAEZ, the same male with whom I had done the prior
transactions, approach my driver's side window.  I gave him $250.00 in OAF and in exchange he
provided me with suspected fentanyl. Based upon my training and experience I recognized this
substance to be consistent with fentanyl. Due to current DEA protocols and the potential danger
of testing fentanyl a field test was not completed on the substance. BAEZ then walked back in
the direction of his house. On March 2, 2022, I received the DEA lab results for the suspected

fentanyl, which indicated the substance purchased was positive for fentanyl. The lab indicated the weight of the fentanyl was 20.132 grams.

**Controlled Buy #6:**

31.  On February 14, 2022, 11:27 a.m., I contacted VILLAR-LUGO on the Meta application to arrange an undercover purchase of fentanyl. The conversation follows:

- UC: Hey Bro. Can I come see you.
- VILLAR-LUGO: Hey When
- UC: I can be down there in like an hour
- VILLAR-LUGO: Perfect Yes
- UC: Still good for the 10 sticks. I got 1,000
- VILLAR-LUGO: Really. Wtf. Why. hahahaha
- UC: I got customers now!
- VILLAR-LUGO: Ok. My brother
- UC: I thought we talked about it last week about it sorry bro
- R: No problem. And ready for you. Ok

As the conversation progressed, I was directed to Home Depot, 72 Pleasant Valley Street, Methuen, MA. Several minutes later I received another message stating, "67 Pleasant Valley St Methuen, MA, Target is better." Members of the MDO and SPD established surveillance around Target at the address. At approximately 1:32 p.m., I advised VILLAR-LUGO I was at Target. He requested a picture of my shoes and directed me to the bathroom inside the store.

32.  As I was walking into Target, I observed BAEZ also walking into Target with a Hispanic Male, later identified as Leidy Coronado GONZALEZ.  BAEZ was wearing a black winter jacket, backwards baseball cap and ripped jeans. GONZALEZ was wearing jeans and a tan colored sweatshirt and had dyed red hair.  At approximately 1:38 p.m., I entered the restroom

followed a short time later by BAEZ. While inside, I gave BAEZ $1,000.00 in OAF and in exchange BAEZ handed me the suspected fentanyl. Based upon my training and experience I recognized this substance to be consistent with fentanyl. Due to current DEA protocols and the potential danger of testing fentanyl a field test was not completed on the substance. While in the restroom I also observed an unknown white male meet with BAEZ. I observed the white male give BAEZ money in exchange for an unknown substance. BAEZ, the white male, and I exited the bathroom and left the store shortly thereafter.

33.   At approximately 1:48 p.m., SA MacDonald observed BAEZ and GONZALEZ exit Target and walk to their vehicle, a black Honda CRV (MA Registration 2LNG35), which is registered to GONZALEZ. Both BAEZ and GONZALEZ were empty handed when they walked back to the car, indicating they had not made any purchases while inside. SA MacDonald reviewed the Target Security footage and confirmed that neither GONZALEZ nor BAEZ had made any purchases while inside. GONZALEZ also had stayed near the bathroom area in a suspected attempt at counter surveillance.

**Controlled Buy #7:**

34. On February 24, 2022, at approximately 6:21 p.m., I contacted VILLAR-LUGO via the Meta Messenger to purchase fentanyl. The conversation follows:

- UC: Hey bro can I come c u tonight
- VILLAR-LUGO: OK. LKM what you need
- UC: Aight I'm gonna leave Laconia area in a few I'll be there around 8 I'll hit you up when I'm close. $300.00
- VILLAR-LUGO: Perfect OK What time (@ 7:21 PM)
- UC: I'll be in Salem in 15 mins
- VILLAR-LUGO: OK 300$ you have yes?

- •    UC: Yes
- •    VILLAR-LUGO: 70 Pleasant Valley St Methuen, MA 01844  Estados Unidos-

    Walmart

35.  Members of the MDO, Massachusetts State Police, and SPD established surveillance around

Walmart prior to me responding there. I was equipped with audio and video recording devices

for this transaction.  At approximately 8:00 p.m., I arrived at Walmart and received a request

from VILLAR-LUGO to send a picture of my shoes. I sent the picture and was directed to go

into the bathroom at Walmart.

36.  At approximately 8:12 p.m., Sgt. Tirella observed the black CRV arrive in the parking lot,

occupied by several people. Detective White observed the vehicle park on the east side of the

Walmart lot. TFO White then observed BAEZ, wearing a red puffy jacket, black jeans and red

shoes exit the vehicle and walk to the front of the Walmart.

37.  I entered the bathroom of Walmart and waited several minutes. At approximately 8:15 p.m.,

I observed BAEZ enter the bathroom. BAEZ gave me the suspected fentanyl over the bathroom

stall and in exchange I gave BAEZ $300.00 in OAF. Based upon my training and experience I

recognized this substance to be consistent with fentanyl. Due to current DEA protocols and the

potential danger of testing fentanyl a field test was not completed on the substance. As BAEZ

left the bathroom, I was able to capture him on video.

38. At about the same time, TFO Hamel observed BAEZ exit the bathroom while talking on the

phone. BAEZ met GONZALEZ and HF2 inside the store. Both HF2 and GONZALEZ have been

present during previous controlled purchases, apparently acting as lookouts for the DTO. At

approximately 8:20 p.m., TFO O'Connor observed BAEZ, GONZALEZ and HF2 waiting in line

at the checkout. Approximately one minute later, they walked out the door and back towards their vehicle and eventually departed the area.

**Agents Identify GONZALEZ and BAEZ:**

39.  On March 3, 2022, members of the MDO set up surveillance on the CRV at 70 Union Street, Methuen, MA. At approximately 11:40 a.m., SA MacDonald and I observed GONZALEZ and BAEZ exit the residence and enter the vehicle. They traveled northbound through Methuen, towards New Hampshire. At the request of SA MacDonald, Methuen Police Officer Tardiff conducted a motor vehicle stop on the CRV to identify the occupants. During the stop, the driver identified herself as Leidy Coronado GONZALEZ of 70 Union Street, Apt 5, Methuen, MA. The passenger identified himself as Angel BAEZ of the Dominican Republic.

**Controlled Buy #8**

40.  On March 9, 2022 at approximately 10:10 a.m., I contacted VILLAR-LUGO via the Meta Messenger application to purchase fentanyl. The conversation was as follows:

- UC: Yo
- VILLAR-LUGO: yo
- UC: My messenger is all fucked up but I'm trying to come see you did you get my text on the number
- VILLAR-LUGO: Come an ready. (608) 579-9202. This is my number
- UC: 6179256584 is me ok
- VILLAR-LUGO: OK. Perfct

41.  At approximately 11:28 p.m., I placed a phone call to the number provided by VILLAR-LUGO, 6179256584. During the conversation I spoke with a male whom I believed to be VILLAR-LUGO who asked me what I needed. I advised him I had $250.00 to which he responded "ok." VILLAR-LUGO advised he would send me an address in the next 30 minutes to facilitate the transaction.

42.  At approximately 12:22 p.m., I continued my conversation with VILLAR-LUGO via the Facebook Messenger Application. The conversation was as follows:

- UC: Hey I will be there in 20 mins
- VILLAR-LUGO: 70 Pleasant Valley St Methuen, MA 01844 Estados Unidos. Walmart Methuen
- UC: Ok 20 mins
- VILLAR-LUGO: send picture of your shoes. Go to bathroom

43.  At approximately 12:45 p.m., members of the DEA and SPD established surveillance in the area of Walmart. At approximately 1:05 p.m., I entered Walmart and responded to the bathroom as instructed by VILLAR-LUGO. A short time later I observed Baez enter the bathroom stall next to me. Once in the stall Baez provided me with the suspected fentanyl and in exchange I provided him with $250.00 in OAF. I subsequently left Walmart and ended my contact with Baez.

**Meta Warrant Completion**

44.  On March 16, 2022 I completed a search warrant and supporting affidavit for the https://www.facebook.com/raldy.lara Meta account. The search warrant was subsequently granted by the Honorable Judge Andrea K. Johnstone and uploaded to Meta.

**Controlled Buy #9**

45.  On March 24, 2022 at approximately 1:24 p.m., I contacted VILLAR-LUGO via the phone number (608) 579-9202 to purchase fentanyl. The conversation was as follows:

- UC: Yooo can I cone see you
- VILLAR-LUGO: Uou. Yes and ready have fire (based upon my training and experience I know "Fire" to be a term for potent fentanyl).
- UC: My man. You do like 25g for 300?
- VILLAR-LUGO: ok come
- UC: wont be there until like 3-330 in Laconia ill let u know
- VILLAR-LUGO: Perfct ok

46.  At approximately 2:28 p.m., I advised VILLAR-LUGO I was in the area of

Methuen/Lawrence, MA. VILLAR-LUGO directed me to respond to Burger King, 95 Pleasant

Valley Street, Methuen, MA and instructed me to go to the bathroom.

47.  Members of the DEA subsequently established surveillance in the area of Burger King. At

approximately 2:51 p.m., I arrived at Burger King and responded to the bathroom. Once inside I

made contact with a male whom I immediately recognized to be Albert VENTURA. VENTURA

is known to me through prior contacts and was arrested by the DEA several months prior.

VENTURA provided me with the suspected fentanyl and in return I provided him with the

$300.00 in OAF. I then left the bathroom and ended my contact with VENTURA. VENTURA

was later seen entering into the Honda CRV registered to him.

**April 8, 2022 First Meta Warrant Review**

48.  On April 8, 2022 I received the requested information on the search warrant from Meta. SA

MacDonald and I reviewed the account information and it was evident the account was being

used to distribute narcotics. With assistance from DEA analysts we were able to identify over

100 customers of this DTO that are using the Meta Messenger Application to complete narcotics

transactions. A thorough review of individual conversations between customers and the DTO

was completed. The results of this review is there have been over 8 kilograms of fentanyl

distributed to multiple customers from this DTO. In addition to the fentanyl there were also two

firearms sold to the DTO utilizing the Meta Messenger Application. The narcotics transactions

were consistent from October to March 16 (expiration of the search warrant information)

indicating the account is still actively being used by this DTO.

49.  After further review of the information provided by Meta the Visa Card 411770-XX-

XXXX-5311 was shown to be associated with this account. Based upon my training

and experience I know DTO's frequently send and receive money through various

online platforms. Any transaction history associated with the Facebook Account would provide further information into the inner-workings of this DTO and further assist with identifying other involved individuals.

**Arrest of additional Confidential Source (CS-2)**

50. On May 23, 2022 the Nashua Police Department arrested a Confidential Source, herein referred to as CS-2. I debriefed CS-2 and CS-2 provided information into the RALDY DTO which was consistent with what investigators had learned thus far in this case. CS-2 advised CS-2 could purchase fentanyl from the DTO and has been doing so for several years.

**June 3, 2022 2nd Meta Warrant Review**

51. On June 3, 2022 I reviewed the information provided by Meta for the information on raldy.lara account from March 16 - May 16. After reviewing the information it was evident the DTO is continuing to use this Meta Account as a means of selling fentanyl. The DTO sold multiple additional kilograms of fentanyl to various customers throughout NH and MA.

**Controlled Buy 10**

52. On July 5, 2022 TFO O'Connor and I made contact with CS-2 to set up a controlled purchase of fentanyl. At approximately 12:00 p.m., CS-2 contacted VILLAR-LUGO via the Meta messenger application on the "Raldy.lara" account. The conversation was as follows:

- CS-2: Yooo
- CS-2: I need 45
- VILLAR-LUGO: 45 g?
- CS-2: Yes
- VILLAR-LUGO: OK
- CS-2: Where do I go
- VILLAR-LUGO: Lawrence. Lkm when close. Go loop
- VILLAR-LUGO: You have cash app
- CS-2: No
- VILLAR-LUGO: ok

53. At approximately 12:15 p.m., CS-2 received a phone call via Meta from VILLAR-LUGO.
VILLAR-LUGO directed CS-2 to travel to 120 Willow Street, Lawrence, MA to complete the
transaction. Members of the MDO and MSP subsequently established surveillance in the area
of the anticipated transaction.

54. Prior to the deal CS-2 and CS-2's vehicle were searched by TFO O'Connor and I. Both were
clear of any contraband. CS-2 was provided with $600.00 in OAF and also provided with both
audio and video transmitting equipment.

55. At approximately 12:55 p.m., CS-2 arrived at 120 Willow Street and parked on the side of the
street. A short time later surveillance observed a Hispanic male later identified as, Elaine
VILLAR-SOTO, approach the passenger's side of CS-2's vehicle. VILLAR-SOTO reached
into the passenger's side window and a short time later he walked away from the vehicle. CS-2
then contacted me and advised CS-2 had just completed the transaction with a Hispanic male
who came to his passenger's side window.

56. CS-2 then left the area and travelled directly to the pre-determined meeting location. Upon
making contact with CS-2 he relinquished the suspected fentanyl to me. CS-2 stated CS-2
travelled to 120 Willow Street and parked on the side of street. CS-2 was then approached by
VILLAR-SOTO on the passenger's side of CS-2's vehicle. CS-2 provided VILLAR-SOTO
with the $600.00 in OAF and in exchange VILLAR-SOTO provided CS-2 with the suspected
fentanyl. After the transaction members of surveillance observed VILLAR-SOTO enter into an
apartment in the area of 109 Spruce Street.

57. I later reviewed the audio and video recordings from the transaction and was able to capture a
still image of VILLAR-SOTO. CS-2's account of the incident was consistent with my review
of the audio and video recordings of the transaction.

**Agents Identify Elaine VILLAR-SOTO**

58. On July 11, 2022 members of the DEA assisted the MSP in executing an arrest and search

warrant at 109 Spruce Street in Lawrence, MA for an unrelated investigation. During the execution of the search warrant VILLAR-SOTO was located within a bedroom and appeared to be living within the apartment. VILLAR-SOTO was identified via several documents and taken into custody by MSP.

**Controlled Buy 11**

59. On July 12, 2022 TFO O'Connor and I made contact with CS-2 to set up a controlled purchase of fentanyl. At approximately 11:37 a.m., CS-2 contacted VILLAR-LUGO via the Meta messenger application on the "Raldy.lara" account. The conversation was as follows:

- CS-2: Yoo
- CS-2: I'm like 20 mins away ima need 70. Where should I be
- VILLAR-LUGO: Go Loop
- VILLAR-LUGO: How much money you have for those 70
- CS-2: 800
- VILLAR-LUGO: ok

60. Prior to the deal CS-2 and CS-2's vehicle were searched by TFO O'Connor and I, and were clear of any contraband. CS-2 was provided with $800.00 in OAF and also provided with both audio and video transmitting equipment.

61. At approximately 1:20 p.m., the conversation continued via the Meta messenger application and CS-2 was directed to Wendy's, 95 Pleasant Valley Street, Methuen, MA. Members of the MDO subsequently established surveillance in the area of Wendy's. CS-2 travelled to Wendy's where constant surveillance was maintained on CS-2. The conversation between CS-2 and VILLAR-LUGO continued as follows:

- CS-2: Pullin up. Here. Go in?
- VILLAR-LUGO: Yes go to store
- CS-2: ok. Here way
- VILLAR-LUGO: Send picture. Nada Hat shoes you in.
- CS-2: (Sent photograph)

62. At approximately 1:30 p.m., CS-2 entered Wendy's. At approximately 1:35 p.m., a Hispanic

male, later identified as, Felix Manuel MEJIA-GONZALEZ, entered Wendy's. A short time

later CS-2 exited Wendy's, returned to CS-2's vehicle and left the area. I was contacted by CS-

2 who advised CS-2 completed the transaction in the restroom of Wendy's. CS-2 provided a

description of the male which matched that of MEJIA-GONZALEZ.

63. CS-2 then travelled to the pre-determined meet location where CS-2 met with TFO O'Connor

and I. Upon making contact, CS-2 relinquished the suspected fentanyl to me. CS-2 and CS-2's

vehicle were searched for contraband with negative results. CS-2 was debriefed on the

transaction and stated CS-2 entered the Wendy's restroom upon request of VILLAR-LUGO.

CS-2 stated once inside CS-2 met with MEJIA-GONZALEZ near the urinal. CS-2 provided

MEJIA-GONZALEZ with the $800.00 in OAF and in exchange MEJIA-GONZLAEZ provided

CS-2 with the suspected fentanyl.

64. I later reviewed the audio and video recordings of the transaction which were consistent with

CS-2's account of the incident.

**Controlled Buy 12**

65. On July 26, 2022 TFO O'Connor and I made contact with CS-2 to set up a controlled purchase

of fentanyl. At approximately 11:50 a.m., CS-2 contacted VILLAR-LUGO via the Meta

messenger application on the "Raldy.lara" account. The conversation was as follows:

- CS-2: Yoooo. I got 800.
- VILLAR-LUGO: Ok
- CS-2: I'm in Salem
- VILLAR-LUGO: Ok
- VILLAR-LUGO: Go Loop. Wendys
- CS: Tato
- VILLAR-LUGO: What time
- VILLAR-LUGO: Ok

66. Prior to the deal CS-2 and CS-2's vehicle were searched by TFO O'Connor and I, and were

clear of any contraband. CS-2 was provided with $800.00 in OAF and also provided with both audio and video transmitting equipment.

67. At approximately 12:00 p.m., CS-2 travelled to Wendy's were constant surveillance was maintained on CS-2. CS-2 continued the conversation with VILLAR-LUGO as follows:

- CS-2: Here
- VILLAR-LUGO: ok. Wendys?
- CS-2: Yes papa
- VILLAR-LUGO: How much money
- CS:2: 800
- VILLAR-LUGO: Ok
- CS-2: WAY
- VILLAR-LUGO: Go Burger King Is Better
- CS-2: ok
- VILLAR-LUGO: Here now
- CS-2: Here.
- VILLAR-LUGO: Go bathroom.

68. During this conversation members of the MDO set up surveillance in the area of Burger King, which is located across the street from Wendy's. At approximately 12:26 p.m., CS-2 entered Burger King. A short time later CS-2 exited Burger King and returned to CS-2's vehicle. CS-2 contacted me and advised CS-2 had left his/her cellular phone in the vehicle and was returning to finish the transaction. CS-2 retrieved the phone and went back into Burger King.

69. At approximately 12:30 p.m., CS-2 exited Burger King and returned to CS-2's vehicle. CS-2 contacted me and advised CS-2 had completed the transaction in the Burger King bathroom with the same person as the last deal, MEJIA-GONZALEZ. This information was subsequently relayed to the surveillance members of the MDO.

70. CS-2 then travelled to the pre-determined meet location where TFO O'Connor and I met with CS-2. Upon making contact, CS-2 relinquished the suspected fentanyl to me. CS-2 and CS-2's vehicle were searched for contraband with negative results. CS-2 was debriefed on the

transaction and stated CS-2 entered the Burger King restroom upon request of VILLAR-

LUGO. CS-2 stated once inside CS-2 met with MEJIA-GONZALEZ near the urinal. CS-2

provided MEJIA-GONZALEZ with the $800.00 in OAF and in exchange MEJIA-GONZLAEZ

provided CS-2 with the suspected fentanyl.

71. I later reviewed the audio and video recordings of the transaction which corroborated CS-2's

account of the incident. Furthermore, I was able to capture a still image of MEJIA-

GONZALEZ.

**Agents Identify Felix MEJIA-GONZALEZ**

72. On July 27, 2022 investigators compared surveillance photographs from the controlled

purchases with photographs from internal DEA databases. Through research it was determined

the surveillance photographs matched a picture of MEJIA-GONZALEZ.

**Controlled Buy 13**

73. On August 9, 2022 TFO O'Connor and I made contact with CS-2 to set up a controlled

purchase of fentanyl. At approximately 10:30 a.m., CS-2 contacted VILLAR-LUGO via the

Meta messenger application on the "Raldy.lara" account. The conversation was as follows:

- CS-2: Yoo I have 700
- CS-2: How long? Try to be fast cuz I have to go to work
- VILLAR-LUGO: Ok what time
- CS-2: I'll be there in 20 mins Where do I go?
- VILLAR-LUGO: Ok. Go Loop Wendys
- CS-2: Ok I'm Passing Salem I'll be there in 10-15 min
- VILLAR-LUGO: Ok

74. Prior to the deal CS-2 and CS-2's vehicle were searched by TFO O'Connor and I, and were

clear of any contraband. CS-2 was provided with $700.00 in OAF and also provided with both

audio and video transmitting equipment.

75. During the aforementioned conversation TFO's Judd and Sutter established surveillance at 139

E. Haverhill Street, the known location of MEJIA-GONZALEZ. During surveillance MEJIA-

GONZALEZ was seen leaving the address and entering into a Taxi. Members of surveillance were able to follow this Taxi directly to Burger King.

76. At approximately 11:05 a.m., CS-2 arrived at Wendy's, 90 Pleasant Valley Street, Methuen, MA. CS-2 continued the conversation with VILLAR-LUGO via META as follows:

- CS-2: I'm here
- VILLAR-LUGO: Ok
- CS-2: WAY? How long I gotta go to work bro
- VILLAR-LUGO: Coming now 4 minutos Wendys
- CS-2: Ok
- VILLAR-LUGO: omg sorry go Burger King
- CS-2: Ok

77. This conversation was relayed to members of surveillance who set up in the area of Burger King. At approximately 11:49 a.m., CS-2 arrived at Burger King and entered into the restaurant. At approximately the same time, the aforementioned Taxi arrived at Burger King. MEJIA exited the Taxi and entered Burger King.

78. At approximately 11:55 a.m., CS-2 exited Burger King and departed the area. TFO O'Connor and I met with CS-2 who relinquished the suspected fentanyl. CS-2 and CS-2's vehicle were searched for contraband with negative results. CS-2 was debriefed on the transaction and stated CS-2 entered the Burger King restroom upon request of VILLAR-LUGO. CS-2 stated once inside CS-2 met with MEJIA-GONZALEZ near the urinal. CS-2 provided MEJIA-GONZALEZ with the $700.00 in OAF and in exchange MEJIA-GONZLAEZ provided CS-2 with the suspected fentanyl. I was able to corroborate CS-2's account of the incident after reviewing the video of the transaction.

**September 7, 2022 3rd Meta Warrant Review**

79. On September 7, 2022 I reviewed the information provided by Meta for the information on raldy.lara account from May 16, 2022-August 18, 2022. After reviewing the information it was evident the DTO is continuing to use this META Account as a means of selling fentanyl. The

DTO continues to sell multiple additional kilograms of fentanyl to various customers throughout NH and MA. This includes multiple daily drug transactions over the span of the aforementioned time period.

**November 2, 2022 Execution of SW at 70 Union Street, Methuen, MA**

80. On October 28, 2022 Judge Jennifer Boal granted a Federal Search Warrant for 70 Union Street, Methuen, MA, the residence of Yonathan BAEZ-SANTOS. On November 2, 2022 members of the MDO, MSP and Methuen PD executed the search warrant. During the execution of the search warrant BAEZ-SANTOS was taken into custody for an unrelated drug trafficking warrant issued by the Massachusetts State Police. Quantities of suspected fentanyl and crack cocaine were seized from BAEZ-SANTOS's residence.

**Controlled Buy 14**

81. On December 12, 2022 I made contact with CS-2 in order to have CS-2 set up a controlled purchase with the RALDY DTO for the following day. The conversation was via the META Messenger application with the account raldy.lara. The conversation was as follows:

- CS-2: yoooooo
- VILLAR-LUGO: Yooo
- CS-2: My b at work ima come c u tomoro night after work I need the fire
- VILLAR-LUGO: Ok Lkm

82. On December 13, 2022 TFO Judd and I made contact with CS-2. Under my direction CS-2 again contacted the RALDY DTO via the META Messenger Application. The conversation was as follows:

- CS-2: Yoooo
- VILLAR-LUGO: Yoo
- CS-2: Yooo I'm coming now
- VILLAR-LUGO: Ok
- CS-2: ill be there T 745. I have $400
- VILLAR-LUGO: Ok Come.

83. Prior to the deal CS-2 and CS-2's vehicle were searched by TFO Judd and were clear of any contraband. CS-2 was provided with $400.00 in OAF and also provided with both audio and video transmitting equipment.

84. At approximately 7:39 p.m., CS-2 continued the conversation with the RALDY DTO via META as follows:

- CS-2: WYA
- VILLAR-LUGO: Whew you?
- CS-2: Salem
- VILLAR-LUGO: 4 finger?
- CS-2: Si. I can't be all night I have to get home to my kids?
- VILLAR-LUGO: Ok send address
- CS-2: Where
- VILLAR-LUGO: 400 Lowell Ave Haverhill, MA 01832 Estados Unidos. Marshall
- CS-2: Ok 15-20 min

85. Members of the MDO, Nashua PD, and MSP established surveillance in the area of Marshalls for the anticipated transaction. CS-2 travelled to Marshalls under constant surveillance by TFO Judd and I. At approximately 8:30 p.m., CS-2 arrived at Marshalls and further continued conversing with the DTO via META as follows:

- VILLAR-LUGO: Send picture of shoes: Yoo.
- CS-2: Ok
- VILLAR-LUGO: ??? What time picture of your shoes.
- CS-2: (sent picture of shoes)
- VILLAR-LUGO: Go bathroom now. Marshall. In Here.
- CS-2: ok
- VILLAR-LUGO: In Bathroom
- CS-2: Coming

86. During this conversation TFO Hamel observed a Liberty Taxi drop off a Hispanic Male (HM-1) in front of Marshalls. HM-1 entered Marshalls and walked into the restroom. At approximately 8:42 p.m., CS-2 entered Marshalls and walked directly toward the bathroom.

87. At approximately 8:46 p.m., CS-2 exited Marshalls and left the lot responding directly to the

pre-determined meeting location to meet with TFO Judd and I. Surveillance was maintained on HM-1 who exited Marshalls a short time after CS-2 and entered into the same taxi he arrived in. Surveillance followed the taxi to 134 E. Haverhill Street, Lawrence, a known area which the DTO operates out of.

88. TFO Judd and I made contact with CS-2 who immediately relinquished the suspected fentanyl. CS-2 advised CS-2 met with a Hispanic male in the bathroom of Marshalls and CS-2 provided the male with the $400.00 in OAF. In exchange the male provided CS-2 with the suspected fentanyl. I was able to later corroborate these statements after reviewing the video recordings of the transaction. CS-2 and CS-2's vehicle were again searched and free of any contraband.

**DTOs Use of Meta (Facebook) Accounts:**

89.  I know in my investigative experience that drug traffickers often "friend" other co-conspirators and take photographs and post them to their Meta accounts. I also believe that this search warrant will allow agents to identify other co-conspirators not yet known to this investigation. I also know that drug traffickers will often attempt to contact drug customers through Meta. In my experience, traffickers believe they will be safer if they investigate a potential customer's social media presence prior to meeting face to face. Traffickers believe that if they see a stronger social media presence, the less likely the customer could be an undercover officer.

90.  A preservation request was served on Meta for the account associated with https://www.facebook.com/raldy.lara on October 13, 2021. Meta has indicated that it has taken reasonable steps to preserve this account.

91. Meta Platforms Inc owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Meta allows its users to establish accounts with Meta, and users can then use their accounts to share written news, photographs, videos, and other information with other Meta users, and sometimes with the general public.

92. Meta asks users to provide basic contact and personal identifying information to Meta, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Meta passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Meta also assigns a user identification number to each account.

93. Meta users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Meta assigns a group identification number to each group. A Meta user can also connect directly with individual Meta users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Meta and can exchange communications or view information about each other. Each Meta user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

94. Meta users can select different levels of privacy for the communications and information associated with their Meta accounts. By adjusting these privacy settings, a Meta user can make information available only to himself or herself, to particular Meta users, or to anyone with access to the Internet, including people who are not Meta users. A Meta user can also create "lists" of Meta friends to facilitate the application of these privacy settings. Meta accounts also

include other account settings that users can adjust to control, for example, the types of notifications they receive from Meta.

95.  Meta users can create profiles that include photographs, lists of personal interests, and other information. Meta users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Meta users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Meta users can "check in" to particular locations or add their geographic locations to their Meta posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

96.  Meta allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Meta users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Meta's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

97.  Meta users can exchange private messages on Meta with other users. Those messages are stored by Meta unless deleted by the user. Meta users can also post comments on the Meta profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Meta has a chat feature that allows users to send and receive instant messages through Meta Messenger. These chat communications are

stored in the chat history for the account. Meta also has Video and Voice Calling features, and although Meta does not record the calls themselves, it does keep records of the date of each call.

98.  If a Meta user does not want to interact with another user on Meta, the first user can "block" the second user from seeing his or her account.

99.  Meta has a "like" feature that allows users to give positive feedback or connect to particular pages. Meta users can "like" Meta posts or updates, as well as webpages or content on third-party (i.e., non-Meta) websites.

100. Meta has a search function that enables its users to search Meta for keywords, usernames, or pages, among other things.

101. Each Meta account has an activity log, which is a list of the user's posts and other Meta activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Meta page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Meta page.

102. Meta also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

103. In addition to the applications described above, Meta also provides its users with access to thousands of other applications ("apps") on the Meta platform. When a Meta user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

104.Meta also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Meta, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Meta profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

105.Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Meta users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

106.As explained herein, information stored in connection with a Meta account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Meta user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Meta account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and

tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Meta account at a relevant time. Further, Meta account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.

107.     Such information allows investigators to understand the geographic and chronological context of Meta access, use, and events relating to the crime under investigation. Additionally, Meta builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Meta "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Meta account owner. Last, Meta account activity may provide relevant insight into the Meta account owner's state of mind as it relates to the offense under investigation. For example, information on the Meta account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

108.     Therefore, the computers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Meta, such as account access information, transaction information, and other account information.

/s/ John Hannigan
John Hannigan, Task Force Officer
Drug Enforcement Administration

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim.

P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: **Jan 17, 2023**

Hon. Andrea K. Johnstone
United States Magistrate Judge

Time: **4:27 PM, Jan 17, 2023**

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Meta (Facebook) account associated with the account www.facebook.com/raldy.lara that is stored at premises owned, maintained, controlled, or operated by Meta Inc., a company headquartered in Menlo Park, California.

# Attachment B

## Particular Things to be Seized

**Information to be disclosed by Meta**

For the time period from August 18, 2022 to the present, to the extent that the information described in Attachment A is within the possession, custody, or control of Meta Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18

U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts and other Meta activities;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Meta user identification numbers; groups and networks of which the user is a member, including the groups' Meta group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Meta applications;

(e)    All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)    All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)    All "check ins" and other location information;

(h)    All IP logs, including all records of the IP addresses that logged in to the account;

(i)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

2

(j)     All information about the Meta pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Meta searches performed by the account;

(m)    All information about the user's access and use of Meta

        Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any

        payments associated with the service (including any credit card or bank

        account number); including any and all transactions associated with the

        Visa Card 411770-XX-XXXX-5311.

(p)     All privacy settings and other account settings, including privacy settings

        for individual Meta posts and activities, and all records showing which

        Meta users have been blocked by the account;

(q)     All records pertaining to communications between Meta and any

        person regarding the user or the user's Meta account, including

        contacts with support services and records of actions taken.

        Meta is hereby ordered to disclose the above information to

the government within **14 days** of issuance of this warrant.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. § 841 (distribution of controlled substances and possession with intent to distribute controlled substances), 21

U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances), and 21 U.S.C. § 843(b) (unlawful use of a communication facility) involving Melvin VILLAR-LUGO since August 18, 2022, including, for each user identified on Attachment A, information pertaining to the following matters:

(a) The unlawful acquisition, possession or distribution of controlled substances and the unlawful use of a communication facility;

(b) Evidence indicating how and when the Meta account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Meta account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(e) The identity of person(s) who communicated with the user about matters relating to the acquisition, possession, or distribution of controlled substances.

4